[No. B211821. Second Dist., Div. Four. Oct. 22, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ARNULFO VARGAS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Background parts 1, 3, 4, Defendant's Arrest, Discussion part I.B., and II.

Counsel

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Robert David Breton, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**WILLHITE, Acting P. J.**—A jury convicted defendant Arnulfo Vargas of various sex offenses against four victims—Shosh G., Maria R., Tamika G., and Bin Z.—and also found true three so-called "one strike" allegations.[1] The trial court sentenced defendant to three consecutive terms of 25 years to life in state prison, one consecutive term of 15 years to life, and a total consecutive determinate term of 61 years.[2]

On appeal, defendant raises two contentions under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), and its

---

[1] All section references are to the Penal Code. The jury convicted defendant of the following offenses: as against Shosh G., forcible rape (counts 1 & 21; § 261, subd. (a)(2)), kidnapping to commit rape (count 17; § 209, subd. (b)(1)), sexual penetration by a foreign object (count 18; § 289, subd. (a)(1)), forcible oral copulation (count 19; § 288a, subd. (c)(2)), and forcible sodomy (count 20; § 286, subd. (c)(2)); as against Maria R., forcible rape (count 3), forcible oral copulation (count 5), and sexual penetration by a foreign object (count 6); as against Tamika G., kidnapping to commit rape (count 11), forcible rape (count 12), and forcible oral copulation (count 13); and as against Bin Z., kidnapping to commit rape (count 14), forcible rape (count 15), and second degree robbery (count 16; § 211). The jury acquitted defendant of kidnapping Maria R. to commit rape (count 2). During jury deliberations, on the People's motion, the trial court dismissed count 4 (forcible oral copulation against Maria R.).

In counts 1, 18, 19, 20, and 21 (Shosh G.), counts 12 and 13 (Tamika G.), and count 15 (Bin Z.), the jury found true one-strike allegations that the offense was committed during a kidnapping as defined in section 207, subdivision (a) (see § 667.61, subd. (e)(1)) and that the offense was committed during an aggravated kidnapping as defined in section 209, subdivision (b)(1) (see § 667.61, subd. (d)(2)). The jury also found true a separate one-strike allegation that defendant was convicted in the present case of two or more designated sex offenses against more than one victim. (§ 667.61, subd. (e)(5).) The jury found a one-strike allegation (§ 667.61, subd. (d)) not true as to counts 3, 5, and 6 against Maria R.

[2] The trial court sentenced defendant as follows: three consecutive terms of 25 years to life in state prison under the one-strike allegations of section 667.61, subdivision (d)(2) for the convictions on count 17 (kidnapping Shosh G. to commit rape), count 12 (forcible rape of Tamika G.), and count 15 (forcible rape of Bin Z.); a fourth consecutive term of 15 years to life for the conviction on count 3 (forcible rape of Maria R.) under the one-strike allegation of section 667.61, subdivision (e)(5); and, as to the remaining counts, a total consecutive determinate term of 61 years.

progeny. First, he contends that the trial court erred in admitting "testimonial" hearsay statements made by Maria R. during a sexual assault examination, requiring reversal of count 3 (forcible rape) and count 6 (sexual penetration by a foreign object). In the published portion of our opinion, we conclude that the court erred in admitting Maria R.'s hearsay statements. The error is harmless beyond a reasonable doubt as to defendant's conviction of count 3 (forcible rape), but not as to his conviction of count 6 (sexual penetration by a foreign object). We therefore reverse the latter conviction and the sentence on that count.

In the unpublished portion of our opinion, we consider defendant's second *Crawford* contention: that the court improperly allowed the sexual assault examinations of Tamika G. and Bin Z. to be described through the testimony of two nonexamining nurses, who relied on the reports prepared by the nurses who performed the examinations. Defendant contends that this error requires reversal of all counts as to those victims. We conclude that defendant has forfeited his challenge to the testimony regarding the sexual assault examinations of Tamika G. and Bin Z. Moreover, even if the admission of that testimony was improper, the error was harmless beyond a reasonable doubt.

We also consider in the unpublished portion of our opinion defendant's claims that the court committed two instructional errors, namely, failing to properly instruct on the elements of kidnapping for rape against Tamika G. and Shosh G. (counts 11 & 17), and failing to instruct on simple kidnapping as a lesser included offense, requiring reversal of those counts. We find no error. We disagree with the legal premise of defendant's argument regarding the instructions on kidnapping for the purpose of rape, and also conclude that he has forfeited the contention. Regarding defendant's argument that the court erred in failing to instruct on simple kidnapping as a lesser included offense, we find no substantial evidence to support the instruction, and in the alternative conclude that defendant suffered no prejudice. Therefore, with the exception of reversing the conviction and sentence on count 6, we affirm the judgment.

## BACKGROUND

1. *Shosh G.—forcible rape (counts 1 and 21), kidnapping to commit rape (count 17), sexual penetration by a foreign object (count 18), forcible oral copulation (count 19), and forcible sodomy (count 20)*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 647.

### 2. *Maria R.—forcible rape (count 3), forcible oral copulation (count 5), and sexual penetration by a foreign object (count 6)*

On September 19, 2001, Ana Cardenas was working at First Legal Support Services at 1511 West Beverly Boulevard in Los Angeles. A young girl later identified as Maria R., perhaps 14 to 17 years old, entered the business. She was shaking and crying. Cardenas asked, in Spanish, what had happened. Maria, speaking in Spanish and crying constantly, told her that a man had forced her into his car and "made [her] do things." When Cardenas asked what things, Maria repeatedly said that he made her give him oral sex.

Later that day, Jean Stephenson, a forensic nurse examiner at California Hospital Medical Center, performed a sexual assault examination on Maria, and completed the standard OCJP-923 report. Referring to the report, Stephenson testified that she asked Maria what had happened to her. Stephenson recorded Maria's response in her report as follows: "[I]t says penetration of vagina by penis and I have marked it yes times two. Finger, yes. . . . For oral copulation of genitals [of] victim by assailant it is marked yes and of assailant by victim it's marked yes times five." As to whether the assailant ejaculated, Stephenson recorded Maria's answer as "yes times two."

In examining Maria, Stephenson observed redness on the genitalia, and abrasions to both sides of the labia majora (the outer lips of the vulva) and to the hymen. In Stephenson's opinion, the injuries were consistent with blunt force trauma. Stephenson collected oral and vaginal swabs.

### 3., 4.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### *Defendant's Arrest*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### *DNA Analysis*

DNA analysis matched samples obtained from Shosh, Bin, and Maria to samples from defendant's oral swab and the used condoms seized from his master bedroom. The parties stipulated to the facts establishing the obtaining of the relevant DNA samples and the chain of custody for those samples.[3]

---

[*] See footnote, *ante,* page 647.

[3] Michael Mastrocovo, a criminalist assigned to the Los Angeles Police Department DNA unit, performed DNA typing on the sperm fraction of a genital swab taken from Bin Z. (item

## DISCUSSION

### I. Crawford *Issues*

 In *Crawford, supra,* 541 U.S. 36, the United States Supreme Court held that the introduction of "testimonial" hearsay statements against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses, unless the witness is unavailable at trial and the defendant has had a prior opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at p. 59.) In subsequent decisions—*Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266], and most recently *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. ___ [174 L.Ed.2d 314, 129 S.Ct. 2527] (*Melendez-Diaz*)—the high court has sought to refine the concept of "testimonial" hearsay. The California Supreme Court has also analyzed that concept in two post-*Davis,* pre-*Melendez-Diaz* decisions, *People v. Cage* (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*) and *People v. Geier* (2007) 41 Cal.4th 555 [61 Cal.Rptr.3d 580, 161 P.3d 104] (*Geier*).

Here, defendant challenges the introduction of two classes of hearsay under *Crawford* and its progeny: (1) Maria R.'s hearsay statements to nurse Jean Stephenson, and (2) hearsay testimony by Stephenson and Julie Lister regarding the OCJP-923 reports of the sexual assault examinations performed on Tamika G. and Bin Z. by other nurses (Chris Pollard as to Tamika, and Gina McConnell as to Bin). We discuss each contention in turn.

### A. *Maria R.'s Statements to Jean Stephenson*

Maria R. did not testify at trial. Rather, the prosecution relied on: (1) Maria's statements to Ana Cardenas, apparently made immediately after the crime while Maria was crying and shaking, that a man had forced her into his car, "made [her] do things," and made her give him oral sex; (2) nurse

---

1-1B) and also performed typing on an oral swab taken from defendant (item 44) and a swab taken from a condom seized from defendant's residence (item 33). The DNA profiles of the condom swab (item 33) and defendant's oral swab (item 44) matched each other, and also matched the sperm fraction of the genital swab from Bin (item 1-1B).

Mastrocovo compared the DNA profiles he obtained from the sperm fraction of Bin's genital swab (item 1-1B) and from the condom swab (item 33) to DNA profiles done by others on two other samples: a profile done by the California Department of Justice on the sperm fraction of a swab taken from Shosh G. (item 1-2B), and a profile done by Orchid Cellmark (a Maryland laboratory that performed DNA analysis for the Los Angeles Police Department) on a swab from Maria R. Mastrocovo found that the DNA profiles of Shosh's and Maria's samples matched the DNA profiles of Bin's sample (item 1-1B) and the condom sample (item 33).

Defendant used a condom in his assault on Tamika, and no DNA evidence was introduced concerning the crimes against her.

Jean Stephenson's sexual assault examination of Maria, during which Maria said, inter alia, that the assailant had penetrated her vagina with his penis and finger and forced her to orally copulate him, and during which Stephenson observed injuries consistent with blunt force trauma to Maria's genitalia; and (3) criminalist Michael Mastrocovo's testimony matching the DNA profile of the sperm fraction of a vaginal swab taken from Maria to defendant's DNA. Based on this evidence, the jury convicted defendant of the following crimes against Maria R.: forcible rape (count 3), forcible oral copulation (count 5), and sexual penetration by a foreign object (count 6).

On appeal, defendant does not challenge the introduction of Maria's statements to Ana Cardenas, and does not challenge his conviction for forcible oral copulation of Maria. He contends, however, that the introduction of Maria's statements to Jean Stephenson—in particular, her statements that her assailant penetrated her with his penis and finger and forced her to orally copulate him—constituted inadmissible, "testimonial" hearsay under *Crawford*, as analyzed by the California Supreme Court in *Cage* and *Geier*. He asserts that the error requires reversal of his convictions for the forcible rape of Maria and for penetration by a foreign object.

■ We conclude that Maria's statements to Stephenson were testimonial and thus inadmissible. We find the error was harmless beyond a reasonable doubt as to defendant's conviction of forcible rape of Maria (count 3), but not as to his conviction of sexual penetration by a foreign object (count 6). Therefore, the latter conviction must be reversed.

### 1. *The OCJP-923 Form*

■ Sexual assault examinations are performed pursuant to a statutorily mandated "protocol for the examination and treatment of victims of sexual assault and attempted sexual assault . . . and the collection and preservation of evidence therefrom." (§ 13823.5, subd. (a).) Part of the procedure is the completion of a mandatory form—called (at the time of the relevant events here) the "OCJP-923" form. (§ 13823.5, subd. (c).)[4]

Before trial, the prosecutor filed a motion in limine to introduce Maria's statements to Stephenson describing the sexual assault. As part of the motion,

---

[4] The acronym "OCJP" stands for the Office of Criminal Justice Planning. At the time of Maria's examination in 2001, former section 13823.5, subdivision (c), made the OCJP responsible for creating the examination form and for establishing a protocol for sexual assault examinations. (Former § 13823.5, subds. (a), (c); Stats. 1988, ch. 1575, § 3, p. 5684.) The Legislature abolished the OCJP in 2003 and directed the Department of Finance to designate another agency to carry out the OCJP's former duties. (§ 13820, subd. (a).) According to Jean Stephenson's testimony at trial, the Office of Emergency Services is now responsible for the examination form, and the current form bears the initials "OES."

the prosecutor produced a copy of the OCJP-923 form completed by Stephenson. The form explained that with the victim's consent "a separate medical examination for evidence of sexual assault at public expense [would] be conducted by a physician to discover and preserve evidence of the assault," and that "the report of the examination and any evidence obtained will be released to law enforcement authorities." The form described the procedure for conducting the physical examination and collecting and recording physical evidence, and also required Stephenson to question Maria about several categories of sex acts. It contained boxes for recording whether the listed acts occurred or were attempted or whether Maria was unsure. (See § 13823.11, subd. (d) [requiring history of sexual assault to be recorded pursuant to outline form].)

### 2. *The Motion in Limine*

At the hearing on the motion in limine, Stephenson did not testify, and the prosecutor did not make a specific offer of proof as to Stephenson's proposed testimony regarding the circumstances or purpose of the examination. Nonetheless, the prosecutor argued that Stephenson questioned Maria using the OCJP-923 form primarily for the purpose of providing treatment following the sexual assault, and that Stephenson's role in obtaining evidence was secondary. Therefore, according to the prosecutor, introduction of the statements was permissible under *Cage*, which held that an injured victim's statements made to a physician "not to obtain proof of a past criminal act, or the identity of the perpetrator, for possible use in court, but to deal with a contemporaneous medical situation that required immediate information about what had caused the victim's wound" (*Cage, supra*, 40 Cal.4th at p. 970) were not testimonial.

Defense counsel argued, by contrast, that the introduction of Maria's statements were testimonial, because Stephenson acted as an agent of law enforcement and questioned Maria not for the purpose of medical treatment, but according to an established protocol for the purpose of gathering evidence for later use in court. The trial court overruled defense counsel's objection, and Stephenson testified at trial.

### 3. *Stephenson's Trial Testimony*

At trial, Stephenson testified that she was a registered nurse and forensic nurse examiner specializing in sexual assault examinations. She had performed more than 500 sexual assault exams. As she explained, in conducting such exams, "[w]e [forensic nurse examiners] collect evidence, . . . document evidence, . . . send the evidence to the crime lab, . . . take photographs and . . . testify in court."

Stephenson described the typical sexual assault examination as follows: "A sexual assault exam consists of an introduction to the patient, a consent to do the exam, a forensic interview on what happened, a very detailed—there is a specific document [the OCJP-923 form] from the State of California on detailed questions regarding the assault and we go through that. We interview with that form and we collect evidence, based on the history or lack of history, and we collect the evidence, document the evidence, identify it, put it in a special sexual assault exam kit, collect the clothes, identify the clothes, complete the form and photograph as we are going along for injuries and/or lack of injuries. [¶] Basically all patients are photographed. [¶] And then we give the patient medication for sexually transmitted diseases as a precaution and also as a precaution for the patient a morning after pill and we then give her instructions regarding her care and where she may have—seek out further care and we also provide an advocate for the patient, an advocate being a counselor, for her for the event and we send their package to the police department. [¶] And that basically consists of the exam." Stephenson also explained that the completed OCJP-923 form would be sent to the police department, a copy would be placed in the sexual assault examination kit for the crime lab, and a second copy would be maintained by the hospital.

Stephenson identified the OCJP-923 form that she completed when she examined Maria R. on September 19, 2001, and a photograph she had taken of Maria. Through a translator, Stephenson informed Maria of the consent portion of the OCJP-923 form, which stated that the examination was to "discover and preserve evidence of the assault," and that "the report of the examination and any evidence obtained will be released to law enforcement authorities." Stephenson explained that the OCJP-923 form requires that the examiner ask certain questions and record the patient's answers by checkmarks. Describing the form she filled out for Maria's examination, Stephenson testified that the form required her to document "physical injuries and/or pain described by [the] patient. She [Maria] said she had a headache and pain in her stomach." According to Stephenson, the completed form also reflected the following: "[I]t says penetration of vagina by penis and I have marked it yes times two. Finger, yes. . . . For oral copulation of genitals [of] victim by assailant it is marked yes and of assailant by victim it's marked yes times five." As to whether the assailant ejaculated, the report says "yes times two."

Stephenson also described her physical examination of Maria as reflected in the diagram portion of the OCJP-923, in which she recorded her observation of redness on the genitalia, and abrasions to both sides of the labia majora (the outer lips of the vulva) and to the hymen. According to Stephenson, the injuries were consistent with blunt force trauma.

As was also reflected in the OCJP-923, Stephenson gathered other physical evidence: she took photographs and pubic combings and collected Maria's

clothing; she collected oral and vaginal swabs and blood samples. All of the evidence was placed in a box, sealed, and given to the Los Angeles Police Department.

### 4. Cage, Geier, *and* Melendez-Diaz

We agree with defendant that under the analysis of the California Supreme Court in *Cage* and *Geier*, Maria's statements to Stephenson were testimonial.

In *Cage*, a 15-year-old boy, suffering from a deep cut on his face, was awaiting treatment at a hospital emergency room when a deputy sheriff asked him what had happened between him and the defendant, the boy's mother. The boy said that while his grandmother held him, the defendant cut him with a piece of glass. (*Cage, supra*, 40 Cal.4th at pp. 971–972.) Later, as part of his standard procedure in treating patients, an emergency room physician asked the boy what had happened. The purpose of the physician's question was to obtain information that might be important in treating the wound. The boy again said that his grandmother had held him down while the defendant cut him. (*Id.* at p. 972.) Finally, after the boy was released from the hospital, the deputy sheriff conducted a tape-recorded interview at the police station in which the boy described the assault in greater detail. (*Id.* at pp. 972–973.)

The California Supreme Court held that the statements to the deputy sheriff were testimonial under *Crawford* and *Davis*, but that the statements to the physician were not. The court's reasoning required the analysis of several factors: "We derive several basic principles from [the United States Supreme Court's decision in *Davis v. Washington, supra*, 547 U.S. 813]. First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage, supra*, 40 Cal.4th at p. 984, fns. omitted.)

Analyzing the statements to the deputy sheriff under these principles, the court concluded that the statements were testimonial because, though somewhat informal, they "were given as an analog of testimony by a witness—they were made in response to focused police questioning whose primary purpose, objectively considered, was not to deal with an ongoing emergency, but to investigate the circumstances of a crime, i.e., 'to "establis[h] or prov[e]" some past fact.' (*Davis, supra*, 547 U.S. 813, [827] . . . .)" (*Cage, supra*, 40 Cal.4th at p. 970.) By contrast, the statements to the physician were nontestimonial: "The primary purpose of the physician's general question [as to what happened], objectively considered, was not to obtain proof of a past criminal act, or the identity of the perpetrator, for possible use in court, but to deal with a contemporaneous medical situation that required immediate information about what had caused the victim's wound." (*Cage, supra*, 40 Cal.4th at pp. 970–971.)

In *Geier, supra*, 41 Cal.4th 555, the California Supreme Court considered "whether the admission of scientific evidence, like laboratory reports, constitutes a testimonial statement that is inadmissible unless the person who prepared the report testifies or *Crawford*'s conditions—unavailability and a prior opportunity for cross-examination—are met." (*Id.* at p. 598.) *Geier* was a rape-murder prosecution in which the laboratory director of Cellmark, Dr. Robin Cotton, testified to the results of DNA testing performed by one of Cellmark's biologists. Relying on the testing biologist's completed forms and notes, Dr. Cotton testified, inter alia, that the defendant's DNA sample matched DNA found in vaginal swabs taken from the victim. (*Id.* at pp. 595–596.)

█ In finding testimony concerning the DNA report admissible, the court "extract[ed from *Crawford* and *Davis*] that a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial." (*Geier, supra*, 41 Cal.4th at p. 605.) Applying this analysis, the court concluded: "There is no question that the DNA report was requested by a police agency. Even if the employees of Cellmark are not themselves members of law enforcement, they were paid to do work as part of a government investigation; furthermore, it could reasonably have been anticipated that the report might be used at a later criminal trial. [The testing biologist's] observations, however, constitute a contemporaneous recordation of observable events rather than the documentation of past events. That is, she recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks. 'Therefore, when [she] made these

observations, [she]—like the declarant reporting an emergency in *Davis*—[was] "not acting as [a] witness[];" and [was] "not testifying." ' [Citation.]" (*Geier, supra*, 41 Cal.4th at pp. 605–606.)

Recently, in *Melendez-Diaz*, a five-to-four decision, the United States Supreme Court held that "certificates of analysis" sworn to by prosecution laboratory analysts before a notary public and showing that seized evidence was cocaine, were testimonial under *Crawford*. (*Melendez-Diaz, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2533].) Noting that the certificates of analysis were in substance "affidavits," and that affidavits were expressly included in *Crawford*'s description of the " 'core class of testimonial statements,' " the majority in *Melendez-Diaz* found "little doubt" that the certificates were testimonial. (*Id.* at p. ___ [129 S.Ct. at p. 2532].) Justice Thomas provided the decisive fifth vote, and authored a concurring opinion in which he explained that he "continue[d] to adhere to [his] position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Citations.]" (*Melendez-Diaz, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2543] (conc. opn. of Thomas, J.).) He "join[ed] the Court's opinion in this case because the documents at issue in this case 'are quite plainly affidavits,' [citation]. As such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause. [Citation.]" (*Ibid.* (conc. opn. of Thomas, J.).)

▪ The reasoning of the majority in *Melendez-Diaz* is inconsistent with the primary rationale relied upon by the California Supreme Court in *Geier* to uphold the introduction of the DNA report in that case—that because a scientific observation "constitute[s] a contemporaneous recordation of observable events rather than the documentation of past events," it is analogous to "the declarant reporting an emergency in *Davis*" and therefore is not testimonial. (*Geier, supra*, 41 Cal.4th at pp. 605–606.) In *Melendez-Diaz*, the majority dismissed the contention of the respondent and the four dissenters that there is a distinction, for confrontation clause purposes, between a "conventional witness" who testifies to past events and is subject to confrontation, and the report of an "analyst" who makes near contemporaneous observations of neutral, scientific test results, and thus is not subject to confrontation. (*Melendez-Diaz, supra*, 557 U.S. at pp. ___–___ [129 S.Ct. at pp. 2535–2540].) Nonetheless, because of the limited nature of Justice Thomas's concurrence, the precedential value of the majority's analysis on this point is unclear as applied to a laboratory analyst's report or a similar forensic report, rather than to, in Justice Thomas's words, " 'formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Citations.]" (*Melendez-Diaz, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2543] (conc. opn. of Thomas, J.); see *People v. Gutierrez*

(2009) 177 Cal.App.4th 654 [99 Cal.Rptr.3d 369]; *People v. Rutterschmidt* (2009) 176 Cal.App.4th 1047 [98 Cal.Rptr.3d 390] [both concluding that *Geier* remains viable]; cf. *People v. Lopez* (2009) 177 Cal.App.4th 202, 206 [98 Cal.Rptr.3d 825] [concluding that it "appears that *Geier* has been disapproved" by *Melendez-Diaz*]; *People v. Dungo* (2009) 176 Cal.App.4th 1388 [98 Cal.Rptr.3d 702] [observing that some of *Geier*'s rationale has been undermined by *Melendez-Diaz*].)

For purposes of our analysis of Maria R.'s hearsay statements to Jean Stephenson, we conclude that even under the view of testimonial hearsay relied upon by our Supreme Court in *Geier* and *Cage*, Maria R.'s statements were testimonial.

### 5. *Maria's Statements Were Testimonial*

First, within the meaning of *Geier*, Stephenson acted "in an agency relationship with law enforcement." (*Geier, supra,* 41 Cal.4th at p. 605.) Pursuant to the consent portion of the OCJP-923, Stephenson informed Maria through a translator that the examination was to "discover and preserve evidence of the assault," and that "the report of the examination and any evidence obtained will be released to law enforcement authorities." As Stephenson explained in her trial testimony, her purpose in conducting a sexual assault examination was to "collect evidence, . . . document evidence, . . . send the evidence to the crime lab, . . . take photographs and . . . testify in court." A copy of the completed OCJP-923 form recording Maria's statements was turned over to the Los Angeles Police Department, along with all other evidence collected. Thus, in examining and questioning Maria for the purpose of collecting evidence to be used by the police in investigating the sexual assault and in possibly prosecuting the offender, Stephenson acted as an agent of law enforcement. (See *People v. Uribe* (2008) 162 Cal.App.4th 1457, 1481 [76 Cal.Rptr.3d 829] [physicians who performed sexual assault examination deemed "part of the 'prosecution team'" under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]]; see also *Medina v. State* (2006) 122 Nev. 346 [143 P.3d 471, 476] [forensic nurse who conducted sexual assault examination and "gather[ed] evidence for the prosecution for possible use in later prosecutions" deemed a police operative under *Crawford*].)

Second, the statements Maria made to Stephenson were, in the words of *Cage*, "out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial," and "occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony." (*Cage, supra,*

40 Cal.4th at p. 984.) Stephenson questioned Maria according to a rigorous, statutorily mandated format designed to have Maria describe the specific sexual acts which she was forced to perform. Thus, like testimony, the interview was intended to make a record of past facts, and it certainly possessed at least "some degree" of "the formality and solemnity characteristic of testimony." Indeed, *Cage* observed that the requisite level of "formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses." (*Id.* at p. 984.) As we explain below, the situation in which Maria was questioned by Stephenson, objectively viewed, does not bear the characteristics of an emergency. We note here, in addition, that because Maria was informed that the results of the sexual assault examination would be given to law enforcement, any "deliberate falsehoods" she gave in responding to Stephenson's questions concerning the sexual assault might well have constituted a criminal offense. Section 137, subdivision (c), provides in relevant part: "Every person who knowingly induces another person . . . to give false material information pertaining to a crime to . . . a law enforcement official is guilty of a misdemeanor." Arguably, had Maria lied to Stephenson about material aspects of the sexual assault, knowing that Stephenson would transmit those lies to the police, Maria would have "induced" Stephenson to give "false material information pertaining to a crime" to the police, and thereby violated section 137, subdivision (c).

Third, " 'objectively . . .' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation," it is clear that the primary purpose of the examination was "to establish or prove some past fact for possible use in a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984.) As we have already noted, pursuant to the consent portion of the OCJP-923, Stephenson informed Maria through a translator that the examination was to "discover and preserve evidence of the assault," and that "the report of the examination and any evidence obtained will be released to law enforcement authorities." As we have also already noted, Stephenson described her purpose in conducting a sexual assault examination as collecting evidence, submitting it for evaluation and testifying in court. She conducted her examination of Maria in accordance with that purpose. Thus, the primary purpose of Maria in describing the assault, and of Stephenson in receiving the statements, was to describe the particulars of the sexual assault for possible transmittal to law enforcement and for possible use in court.

Fourth, unlike the injured victim's statements to the physician in *Cage,* Maria's responses to Stephenson's questions were not made and received "to deal with a contemporaneous medical situation that required immediate information about what had caused the victim's wound." (*Cage, supra,* 40

Cal.4th at p. 970.) Nor was Stephenson's documenting of Maria's statements in the OCJP-923 form analogous to the biologist's "contemporaneous recordation of observable events" in the DNA report in *Geier, supra*, 41 Cal.4th at page 605. True, Maria had been the victim of a sexual assault shortly before the examination, and the questions asked by Stephenson seeking to document the specific nature of the sex acts performed are the type of questions that would also be asked if the primary purpose were to determine the extent of injury, observe the site of injury, and offer treatment. But nothing in the record, viewed objectively, suggests that Stephenson's *primary* purpose in questioning Maria was to elicit information about possible injuries in order to render treatment. To the contrary, the record is undisputed that Stephenson examined and questioned Maria for the primary purpose of documenting the nature of the sexual assault and gathering evidence for transmittal to the police and for possible later use in court. Thus, Maria's statements are most analogous to the statements made by the victim in *Cage* to the deputy sheriff. Like the deputy's purpose in *Cage*, Stephenson's "clear purpose . . . was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving defendant* as part of an inquiry into possible criminal activity." (*Cage, supra*, 40 Cal.4th at p. 985.) That Stephenson may have had a subsidiary purpose to treat any injuries disclosed or suggested by Maria's statements is insufficient to purge the statements of their testimonial character.

Thus, we hold that Maria's statements to Stephenson were testimonial and inadmissible. (See *People v. Gutierrez, supra*, 177 Cal.App.4th 654 [narrative portion of sexual assault examination report containing victim's description of assaults found testimonial].)

*Harmless Error*

"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. [Citation.] 'Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' (*Delaware v. Van Arsdall* [(1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 106 S.Ct. 1431]].) The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' (*Neder v. United States* (1999) 527 U.S. 1, 18 [144 L.Ed.2d 35, 119 S.Ct. 1827].)" (*Geier, supra*, 41 Cal.4th at p. 608.)

Here, the error in admitting Maria's statements was harmless beyond a reasonable doubt as to defendant's conviction of forcible rape of Maria. Even

without Maria's statement to Stephenson that defendant had penetrated her vagina with his penis, there was incontrovertible evidence that sexual intercourse occurred: the vaginal swabs taken from Maria contained spermatozoa with defendant's DNA profile. Moreover, Stephenson observed injuries to Maria's genitalia consistent with blunt force trauma: redness on the genitalia and abrasions to both sides of the labia majora and hymen. Maria told Ana Cardenas a man had forced her into his car and "made [her] do things." When Cardenas inquired, Maria repeatedly said that he made her give him oral sex. Having convicted defendant of forcible oral copulation of Maria (a conviction defendant does not challenge), it is clear beyond a reasonable doubt that a rational jury would have also convicted defendant of forcible rape even in the absence of Maria's statement that defendant had penetrated his vagina with his penis.

Defendant states that it was "entirely possible" Vargas may have ejaculated after oral copulation and inadvertently placed the sperm in Maria's vagina by digital penetration. Thus, the fact that sperm was found in Maria's vaginal sample did not necessarily mean that sexual intercourse occurred. However, nothing in the record supports defendant's suggestion—indeed, it is contrary to common sense. The existence of such a speculative possibility is insufficient to defeat the conclusion that the error in introducing Maria's statement that defendant had sexual intercourse with her is harmless beyond a reasonable doubt.

As to the conviction of forcible penetration by a foreign object, other than Maria's statement to Stephenson that defendant digitally penetrated her vagina, there was no independent evidence to support the conviction. Therefore, the error in admitting that statement is not harmless beyond a reasonable doubt, and the conviction of penetration by a foreign object must be reversed.

B. *Testimony by Stephenson and Lister regarding the reports of the sexual assault examinations on Tamika G. and Bin Z.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Instructional Errors*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 647.

## DISPOSITION

The conviction on count 6—sexual penetration of Maria R. by a foreign object—is reversed, and the eight-year sentence imposed on that count is ordered stricken. The clerk of the superior court is ordered to prepare an amended abstract of judgment so reflecting, and to transmit the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Manella, J., and Suzukawa, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 3, 2010, S178100. George, C. J., did not participate therein.