*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 61**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

ARTHUR WAYNE NAJERA,
*Appellant.*

No. 20230983
Heard February 28, 2025
Filed November 28, 2025

On Appeal of Interlocutory Order

Third District Court, Salt Lake County
The Honorable Vernice S. Trease
No. 211902117

Attorneys:

Derek E. Brown, Att'y Gen., Daniel W. Boyer, Asst. Solic. Gen.,
Salt Lake City, for appellee

Sarah J. Carlquist, Salt Lake City, for appellant

JUSTICE HAGEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1   In the early morning hours, a woman walked into an emergency room and said that she had been raped. While the woman was waiting to be seen in an exam room, an officer arrived to "get the basic information" to assess the situation and report back to his supervisor. Over the course of the twenty-minute encounter that followed, the officer asked the woman only three substantive questions about the incident: where it happened, if she

knew who did it, and if she had a description of the perpetrator. While attempting to answer the officer's questions, the woman volunteered additional details about the assault. She appeared to be thinking aloud as she struggled to recall and process what had just happened to her. As memories would surface, she would gasp, gag, dry heave, cry, hide her face, and tell herself this could not be happening to her.

¶2 After the officer left, the woman was examined by a Sexual Assault Nurse Examiner, or SANE. To avoid subjecting sexual assault victims to multiple examinations, SANEs are nurses trained to provide medical care to victims while simultaneously documenting injuries and collecting evidence for later use by law enforcement. The nurse explained to the woman that she would be doing a head-to-toe exam looking for any injuries and would provide medical treatment as necessary. She explained that she would begin by asking some questions to help guide the exam. During the exam, the woman made additional statements about what had occurred during the assault. The nurse documented the statements in a standard sexual assault examination report, which was provided to law enforcement.

¶3 The State arrested Arthur Wayne Najera and charged him with one count of aggravated kidnapping and six counts of aggravated assault based on the woman's allegations. The woman later passed away from causes unrelated to the assault.

¶4 Because the woman was no longer available to testify at trial, the State filed motions in limine to admit the statements the woman had made to both the officer and the nurse. Najera opposed the motions, arguing that admission of the woman's statements would violate his rights under the Sixth Amendment's Confrontation Clause and the rule against hearsay. The district court held several evidentiary hearings and ultimately granted the State's motions, admitting the statements that the woman made to both the officer and the nurse. Najera then filed a petition for interlocutory appeal, which this court granted.

¶5 We conclude that the woman's statements to the officer are admissible. The Confrontation Clause prohibits the admission of out-of-court statements that are testimonial, meaning that the statements were elicited for the primary purpose of establishing or proving past events for use in a later criminal prosecution. The encounter between the woman and the officer bore little resemblance to a police interview designed to record a witness's

statement as evidence for trial. The woman was in the emergency room awaiting medical care, and the officer made only initial inquires to assess the situation and determine whether a violent suspect was in the immediate area. The use of the woman's statements at trial is not the type of inquisitorial practice that the Confrontation Clause forbids.

¶6 The woman's statements to the officer are also admissible under the excited utterance exception to the hearsay rule. The exception allows the use of out-of-court statements made about a startling event while the declarant is under the stress or excitement of the event. Such statements are deemed reliable because the declarant's heightened state of emotional arousal reduces the capacity for reflective thought and makes it more likely that the statement sprang from the declarant's memory without being changed or distorted. The woman's statements to the officer were largely spontaneous and made under the stress of excitement caused by the assault. The account unfolded as a stream of consciousness, suggesting that the woman was recalling her memories in real time. Her physical reactions to the memories as they surfaced not only demonstrated that she was still under the stress of the event, but also that she had not had an opportunity to reflect on what had happened. Even when her voice was calm, her flat affect appeared to reflect shock or denial rather than the capacity for reflective thought. Based on the video of the woman's interaction with the officer, the district court acted within its discretion in ruling that the woman's statements are admissible as excited utterances.

¶7 We also conclude that the woman's statements to the nurse are admissible. A SANE examination, by its very nature, has mixed purposes of providing medical care and collecting and preserving evidence for a possible prosecution. We do not adopt a categorical rule regarding the testimonial nature of statements made during SANE examinations, but the specific circumstances presented here demonstrate that the primary purpose of eliciting the woman's statements was to provide care. The woman had gone to the emergency room immediately after the assault and had not yet been treated. Although the nurse was documenting the woman's answers on a form approved by the Department of Public Safety, no law enforcement was present during the exam or directing questioning. The nurse explained to the woman that she would be doing a physical examination and providing any needed medical treatment and that the questions she asked would be used to guide

the exam. And although the form completed during the examination was provided to law enforcement, the nurse testified that gathering a history was standard medical practice and would be documented in any medical chart. Under these circumstances, the primary purpose of asking about the assault was not to gather evidence for use at trial, but to properly treat a woman in need of medical care. Therefore, the admission of these statements does not violate the Confrontation Clause.

¶8 Finally, the district court acted within its discretion in admitting the woman's statements to the nurse under the medical diagnosis or treatment exception to the hearsay rule. The court credited the nurse's testimony that there was a medical reason for asking nearly every question listed on the form. Because Najera objected to the admission of the woman's statements in their entirety, the district court considered the statements as a whole and did not parse whether particular statements might be unrelated to a medical purpose. The district court did not abuse its discretion in ruling that the statements are generally admissible. Najera retains the right to raise specific objections to individual statements offered at trial.

## BACKGROUND[1]

¶9 On August 29, 2020, at 1:48 a.m., Beth[2] walked into an emergency room and said she had been raped at about 1:00 a.m. in a nearby parking lot area. Beth was placed in a hospital room. During her hospital visit, Beth spoke with both a police officer and a sexual assault nurse examiner.

*Statements to the Officer[3]*

¶10 Beth was waiting in the hospital room when the officer walked in, just after 2:30 a.m. As he walked in, Beth was sitting on

---

[1] "On interlocutory review, we recount the facts as alleged and in a light most favorable to the ruling below." *State v. Stewart*, 2018 UT 24, ¶ 2 n.1, 438 P.3d 515 (cleaned up). We emphasize that the allegations against Najera have not been proved and he is presumed innocent. *See State v. Jolley*, 2025 UT 9, n.1, 568 P.3d 1040.

[2] A pseudonym.

[3] The record includes body camera footage from the officer of his interview with Beth. Our summary of the interview is based on a review of that footage.

the edge of the bed crying and fidgeting, looking away from the door, and saying, "I don't want to." The officer introduced himself and asked if she wanted to talk with him. She said that she did because she did not "want what ha-happened to [her] to . . . ." She trailed off, then began speaking again saying, ". . . thinking that he's out there . . . ." She then trailed off again. As the officer pulled out his notebook and began to speak, Beth blurted out, "I know I was raped. I'll just tell you that right now."

¶11 The officer explained that he would ask some questions that would "be a little invasive." Beth responded, "Please. Please do." She then fanned her face and put her head in her hands as he explained his plan. The officer said he would "get the basic information" and then "call [his] supervisor from there." Choked up and sniffling, she said "okay" with her head still in her hands.

¶12 Beth responded to the officer's questions about her personal information such as name and date of birth. Then the officer asked, "And where did it occur at, the incident?" She answered pointing to her right, "Right here in the parking lot." He asked, "In the hospital parking lot?" She nodded saying, "Right here. I think [inaudible]. I think so 'cause I didn't walk that far . . . through these emergency room doors."

¶13 The officer then asked, "Do you know who it was?" Beth said, "No, sir. I don't. I don't. I think . . . I'm trying to remember what he . . ." before she trailed off again. Sitting cross-legged on the hospital bed, she put her head in her hands and began to cry. The officer reassured her and told her to take the time she needed. Continuing to cry with her head in her hands, she muttered "oh please," "please," and "please help me father." The officer asked, "Do you have a—do you know a description?" Without looking at the officer, Beth continued to mumble what sounded like a prayer before abruptly raising her head to "tell [him] the story."

¶14 Unprompted, Beth recalled the events leading up to the alleged rape, periodically breaking down crying before continuing. She explained that she had been riding home with a friend when they got into a heated argument, and the friend told her to get out of the car. Beth walked to the nearest bus stop where she sat and tried to contact her son. A young man pulled "up on a bike," asked if she was doing okay, and said he would help her get home. Beth and the young man got on the bus together and began riding it closer to her home. She explained that she was "crying and stuff" on the bus, and a man who boarded at a stop not too far from the

hospital asked, "What's wrong with her?" The young man explained that her friend had left her, and she was "kind of suicidal." Beth volunteered to the officer that she had recently lost her husband, that she had attempted suicide several times, and that she had experienced suicidal thoughts that night.

¶15 Beth put her head in her hand for a minute and then paused as if remembering something. She dropped her voice and said, pointing to her right, "I guess the bus driver stopped out here in front of [the hospital]." She remembered that the man who had recently boarded said, "Well this is close to my stop so I'll just make sure she gets in there." Beth said she and the man got off the bus together.

¶16 Beth recalled that the man was Hispanic, and she stood up and gestured that the man was a "little bit shorter" than her. The officer asked Beth how tall she was, which she answered. Without prompting, Beth described the man's clothing and shaved head. Then staring at the floor she said, "I remember . . ." before burying her face in her hands. The officer assured her she was okay. She again said, "I remember . . ." and lay down on the bed. Beth slowly opened and closed her eyes as if thinking deeply with her hands up at her sides as if preparing to speak. She suddenly gasped and brought her hands to her mouth. She then began waving her hands in front of her face and sat up. Bending over, she began to dry heave.

¶17 With wide eyes, she straightened up and took a number of deep breaths. Through tears, she tried to speak several times before managing to say, "Oh my god." She began breathing rapidly, waving her hand in front of her face, and saying progressively louder, "This isn't me. This isn't supposed to happen to me. Do you understand? This isn't supposed to happen to me."

¶18 Composing herself a bit, she said, "I remember him trying to put his penis in my—not trying, he was . . . he was forcing his penis in my mouth and like gagging me." As she spoke those words, she gasped at times, cried, and nodded as if confirming her memory of the events. She said she remembered a tattoo, then shook her head with her eyes wide and sunk her head into her hands again. She mumbled before repeatedly saying, "This isn't supposed to happen." She stood up from the bed still repeating the phrase while shaking her hands rapidly at her sides as if trying to rid them of something. She moved to the corner, placed her head against the wall, and repeated, "This isn't me. This isn't me." She

then turned, took a breath, and said, "He had a . . . ." She shook her head and said, "I know I have to do this. I know I do. I know I do." She then noticed she had debris in her hair. Shaking her hands again, Beth lamented, "I'm dirty. This is disgusting. This isn't me." She clenched her hands into fists and cried into them saying, "Oh my god. I just want to take a shower." The officer said, "I know."

¶19  Beth returned to the assailant's tattoo, explaining that she had seen a circular tattoo around his bellybutton as he forced his penis in her mouth. She recalled seeing tattoos on his arm as well. As she described what she saw, she would stare at the floor, pause, and nod before continuing as if just remembering or reliving the experience. She began crying, shaking her hands, and pacing again before returning to the corner of the room and bending over facing the wall. She then turned, leaned up against the wall in the corner, wrapped her arms around herself with a shocked look on her face while saying, "Oh, please. Oh, please."

¶20  After taking a moment, she looked away and said, as if to herself, "This isn't supposed to happen to somebody like me. This isn't . . . this isn't supposed to happen." She started to walk toward the bed and then bent over crying. The officer told her to take her time. She paused, then suddenly stood up straight, staring into the distance, and blurted out the name of the young man who had initially helped her.

¶21  She sat down on the bed and continued recalling events with a glazed look on her face. She explained that after they got off the bus at the hospital, she told the man she was thirsty, and he gave her "what [she] thought was a bottle of water." Her sentences became more fractured as she began to cry. The officer asked who gave her the bottle of water and whether it was the young man she had just named. She said that it was not, but rather it was the man who had raped her. She said that he gave her a drink, and she remembered feeling "just not righ . . . ," but before finishing the last word, she insisted that she did not do drugs and only drank occasionally. Then she began wiping off the bedsheet saying it was "disgusting." She stood up and backed away beginning to cry, shaking her hands, and hiding in a different corner of the room while saying, "I don't like it. I don't like it 'cause it's not me." She stood in the corner crying, offering what sounded like a prayer to "Heavenly Father" and pleading, "Please just help me get through this."

¶22 The officer explained that he was going to call his supervisor but would like to ask one more question "if that was okay." He asked, "Was that what he did and then you came here right afterwards?" She explained that she had been between two buildings "right here," pointing to her left. She said there was "like a security light" but at first it was dark. Beth looked to her side and said, "I remember him dragging me by my legs" as she mimed the action. Looking into the distance, she said she remembered "being on grass and it was cold and it was wet." Pointing to her left again, she said, "And I think it was right here. If I stepped outside, I could guarantee you if it was or not." Contemplating for a moment, she said she could not remember her pants, socks, or shoes coming off. But she did remember that "a little while later" she said she had to go, to which the man responded, "No, babe. No, babe. No, babe . . . . You're not gonna to leave this cock hangin'."

¶23 As soon as she repeated those words to the officer, she appeared overwhelmed and began bending over and standing up while saying phrases like, "Oh god!" and "Please just help me." She again repeated what the man said to her before abruptly stating that she had lost a necklace from her husband. Holding her hands out, Beth told the officer she also remembered the man sucking on her finger trying to take off her rings, claiming he could get good money for them. She begged him not to take one that belonged to her husband. Looking to her side, Beth said, "And then I just remember trying to find my pants." She began to choke up, saying, "I have no underwear on. I don't know where my underwear are. I couldn't find them."

¶24 Beth then returned to answering the officer's question about timing. She said that, after putting on her shoes, she "stumbl[ed]" to the hospital while the man yelled after her. She said she "came right to [the] room" where she and the officer were standing and that she had started to cry saying she needed help. She explained that she knew something had happened because her vaginal area was "burning" and she had not been allowed to use the restroom yet. The officer asked her to repeat what she had said about pain, then he excused himself, saying he thought he "ha[d] enough right now."

*Statements to the Nurse*

¶25 At 3:18 a.m., about an hour and a half after Beth entered the hospital, the nurse started to examine her. The nurse began the examination according to protocol with an introduction and

explanation of the exam, which she described as "just a head to toe, to look for any injuries and be able to address any injuries [Beth] might have." She also explained that she would begin with "some questions [to] help guide [the] exam" and then "treat with medications or do x-rays or anything that might seem necessary towards the end."

¶26 During the exam, the nurse completed a standard sexual assault examination form electronically in Utah's forensic medical record database. The report form used by SANEs was developed by various stakeholders, including the Utah Department of Public Safety, SANEs, the forensic laboratory, and the Utah Coalition Against Sexual Assault. Reports in the database are accessible by SANEs and law enforcement but not by the hospitals (or the doctors) that provide care to the individual.

¶27 The report began with Beth's basic personal information, such as her name, date of birth, and medical history, as well as both a law enforcement and a rape kit number. The report then included a summary of the assault transcribed by the nurse, including direct quotes from Beth. Beth's explanation of the events leading up to the alleged rape matched her description to the officer, including the fight with her friend and bus ride. She again explained that after getting off the bus, a man gave her a water bottle and that after drinking it, she "started feeling weird and tired." She emphasized several times that it was "really dark" and her "head hurt" before the man "grabbed" her by her hair. Beth said she "remember[ed] an arm wrapped around [her] chest and he was pulling" her. She again explained the security light coming on and said she could not see his face because he moved away from the light. Beth generally gave the same description of his clothing and mentioned that he had a tattoo.

¶28 She told the nurse that "[h]e tried to cram his penis in [her] mouth," and she "remember[ed] he started pulling [her] jeans down." Beth said she told the man, "Please no!" and tried to hold her knees together. She said that the man put his mouth on her vagina, pushed her legs behind her, and tried to put his penis in her anus but was unsuccessful.

¶29 Beth said she tried to get up and he punched her. She explained that he tried to take her boots off and was "getting mad" so she took her boots off for him. She described him taking her pants partially off and removing her socks. Beth said he "started fingering [her] and us[ing] his fist," which "hurt so bad." At this

point, she said he got behind her and it got dark again. Beth told the nurse that the man tore her underwear off and "penetrated [her] vagina from behind." She described the man wanting to "finish in [her] mouth," but "[a]fter awhile" he said, "I just want to finish." While "[h]e was playing with himself," Beth got herself dressed and "ran to [the] hospital."

¶30  The next few sections of the report consisted primarily of yes or no questions and brief descriptions. Beth specified that the man was a stranger to her, that she bit him on the neck, that he made verbal threats to her, that he slammed her against a brick wall and grabbed her by the hair, that he hit her on the side of the head, and that he choked her. The report noted that the man's penis and finger/hand contacted Beth's genitals and anus, and that his penis contacted her mouth. The nurse indicated that the man's mouth contacted Beth's genitals, breasts, mouth, and neck. The report also included notes about Beth's actions after the assault (i.e., using the bathroom, showering, eating, or brushing teeth).

¶31 In the report, the nurse described Beth's demeanor throughout the exam. The nurse explained that, upon entering the room, Beth was pacing, crying, gagging, and "breathing very rapidly and shallowly." The nurse said Beth dry heaved in the toilet for about two minutes. During her questioning of Beth, the nurse said Beth "spoke in a quavering voice and continued to cry." During the genital exam, she said Beth "winced and cried." And while receiving her discharge instructions, the nurse described Beth crying but noted that her breathing and speech had slowed to a normal pace.

¶32  The next ten pages of the report included charts and diagrams of various body parts. The nurse made note of any cuts, bruises, or other abnormalities she found during her physical examination of Beth. The injuries described included abrasions on her chin, lower lip, and buttocks as well as bruises on her cheek, arm, thighs, knee, upper back, buttocks, and between her breasts. The anogenital exam showed numerous abrasions and bruising in addition to swelling surrounding Beth's anus.

¶33 The report next noted the laboratory and forensic specimens collected during the exam, including blood and urine samples, numerous swabs, debris from Beth's hair, her clothing, and anal/genital photographs. The nurse also indicated medications that the hospital staff gave Beth. The nurse completed the exam at 7:29 a.m.

¶34 The nurse also completed a strangulation report. The report began with questions about the nature of the assault (i.e., how much pressure was applied and where, length of the strangulation, and whether it happened more than once). Beth said that the man strangled her face-to-face around her entire neck for "a couple of seconds" three to four times. On a scale of one to ten, Beth rated the level of pressure applied a ten though she said the pressure was not consistent. When asked if she was shaken or if her head hit anything, she said her head hit a wall.

¶35 The report then moved to questions focused on Beth's thoughts and her interactions with the man (i.e., what she thought was going to happen, the level of fear she experienced, whether the man said anything, what the man's demeanor was like, and how the assault ended). Beth said, "I thought I would die." She explained that the man had a smirk on his face and said, "This should make you orgasm better." She said it ended when she begged him to stop.

¶36 The report concluded with questions centered on Beth's physical condition (i.e., breathing abnormalities, loss of consciousness, changes in vision or hearing, and any ongoing pain). Beth said that during the strangulation she was unable to breathe for a couple seconds, her vision was fuzzy, she was lightheaded, had a headache, and her throat was sore. The only ongoing symptom was a sore throat. The nurse also noted the abrasions to her chin and lip as well as the bruise on her cheek.

*District Court Proceedings*

¶37 Several months later, the State charged Najera with one count of aggravated kidnapping and six counts of aggravated assault after a swab the nurse took from Beth's breast matched his profile in a DNA database. Police later confirmed the match with a buccal swab from Najera. Following a preliminary hearing, at which Beth did not testify, Najera was bound over for trial on all charges.

¶38 Before trial, Beth passed away from causes unrelated to the assault. The State filed motions in limine to admit the statements Beth made to both the officer and the nurse. The State argued that both sets of statements were nontestimonial and were admissible hearsay under the excited utterance exception. *See* UTAH R. EVID. 803(2). Additionally, the State contended that a second exception to hearsay applied to Beth's statements to the nurse because she made them for medical diagnosis or treatment. *See id.* R. 803(4).

¶39 The district court held several evidentiary hearings. Among a number of witnesses and experts, the court heard testimony from the officer and the nurse. While the officer was on the stand, the State played the video of the officer's interview with Beth while periodically pausing the footage to ask questions. After playing the first few minutes, the State asked the officer what Beth's demeanor was upon "making [his] initial contact" with her. The officer responded that Beth was "upset, crying, and seemed a little confused." At a later pause of the video, the officer said that it seemed Beth "was trying to remember things and work through things as she was telling [him] the story." He explained that her demeanor appeared "upset, really—can't believe-it-happened kind of situation."

¶40 The State also asked if the officer had any safety concerns after the first few moments of their conversation. The officer responded, "I had concerns that in that general area there was a suspect out that just committed a sex offense." Based on Beth's statement that the assault occurred in the parking lot and she "didn't walk far" to get to the hospital, the officer was worried that the sexual assault suspect was at large in the general area and "could continue to do it to other people who were out at that time." He explained that he asked Beth for a description of her attacker so that he could provide it to detectives to help with the case "or if the person [was] still out there nearby, we might be able to locate them." He said at that point in the investigation he believed the person was near the hospital and possibly a threat to the public.

¶41 The court also heard testimony from the nurse and received both her sexual assault examination report and strangulation report. The nurse testified that the "mission" of a SANE is to "medically support patients who have reported violence—physical assault, sexual assault." She described the forensic aspect of the exam as "a courtesy" that SANEs provide to patients and law enforcement "while . . . doing a medical exam" so that the "patient doesn't have to go through all of that a second time." She explained that SANEs do the "same things" that an emergency doctor would be doing in these situations—and what doctors did in fact do before SANEs offered these services.

¶42 The State then asked the nurse about each section of her report and how, or if, it was related to Beth's medical diagnosis or

treatment.[4] The nurse explained that certain information on the first page of the report—the date and time of the exam as well as the patient's date of birth, age, complaint, and medical history—is relevant to medical diagnosis or treatment because a nurse would note that information "with any chart." The nurse also explained that the date, time, location, and summary of the assault are relevant to medical diagnosis or treatment because it helps the nurse assess "the injuries" and whether the patient is in the "window" for certain medications, namely "antibiotics" and "pregnancy prophylaxis." The nurse then explained that whether the perpetrator was a stranger or a partner is "important" to medical diagnosis or treatment for "multiple reasons" because a patient could contract a "sexually transmitted infection[]" from a stranger or "if she lives with that person, it could be a safety issue." The nurse next explained that the patient's actions and the suspect's actions are relevant to medical diagnosis or treatment because they can explain "injury" and "trauma." With respect to indicators of drug-facilitated sexual assault, the nurse explained that it is "important to know . . . what kind of drugs could be in her system and address her health that way, if needed." And for the history in the strangulation report, the nurse explained that it was relevant to medical diagnosis or treatment because strangulation "can be life-threatening" and she needs to "know how severe it was" so that the physician can order a "CAT scan" if necessary.

¶43 Additionally, the court heard testimony from a SANE expert called by the defense. The expert had been "a forensic nurse for about 30 years" and "direct[ed] the nurses on a forensic nursing team." She testified that the objectives of a SANE exam "are to provide nursing care, identify injury, collect evidence, provide follow-up services, refer for further assessment by a healthcare provider if necessary, and to complete documentation." But she disagreed with the nurse's statement that a forensic nurse collects evidence merely as a courtesy for law enforcement, explaining that a SANE is "not called unless a crime has been alleged" and "there is a law enforcement investigation that has been opened." She

---

[4] The State did not ask the nurse about the "Describe Subject's Dress During Assault" or "Post Assault Actions by Patient" sections of the report. The State explained to the district court that it was "not trying to get in the suspect's dress." And it further explained that the "State is not arguing at this time that . . . post assault actions by patients . . . fall under the rule."

explained the origins of Utah's sexual assault examination report and that completed reports are only accessible by SANEs and investigative officers. She testified that law enforcement officers are generally not present in the room during SANE exams, but that when physical evidence is collected, law enforcement will be called to collect it immediately.

¶44 After considering all the evidence, the district court granted the State's motions and admitted the statements that Beth made to both the officer and the nurse. Concerning Beth's statements to the officer, the court reasoned that "the primary purpose of the statements . . . was not for establishing or proving events potentially related to a later criminal prosecution." Instead, the court ruled that "[w]hen the circumstances at the time of the statements by [Beth] are viewed objectively, the primary purpose . . . was to enable [the officer] to contact his supervisor and to enable the police's apprehension of a perpetrator of an alleged sexual assault." The district court concluded that most of Beth's statements to the officer were admissible under the excited utterance exception to the rule against hearsay because the statements related to a startling event and "were made while the declarant was under the stress and excitement caused by the event or condition." But the court recognized that certain statements were inadmissible because they were "not related to the alleged sexual assault, such as statements regarding her husband's death and her prior attempted suicides."

¶45 Concerning Beth's statements to the nurse, the district court analyzed their admissibility as a whole because "[d]efense counsel objected generally and not specifically to individual statements in the SANE report." The court determined that the "primary purpose of the SANE examination and report [was] for the purposes of diagnosis and treatment," and therefore the statements were not testimonial for purposes of the Confrontation Clause and were admissible under the medical diagnosis or treatment exception to the rule against hearsay.

¶46 Najera then filed a petition for interlocutory appeal, which this court granted. We have jurisdiction under Utah Code subsection 78A-3-102(3)(h).

## ISSUES AND STANDARDS OF REVIEW

¶47 Najera raises two issues in his interlocutory appeal. First, Najera argues that the district court erred in ruling that Beth's statements to both the officer and the nurse are nontestimonial and

therefore do not implicate the Confrontation Clause. We review a district court's decision to admit testimony that may implicate the Confrontation Clause for correctness. *State v. Poole*, 2010 UT 25, ¶ 8, 232 P.3d 519.

¶48 Second, Najera argues that the district court erred when it allowed the State to introduce those same statements as admissible hearsay. When reviewing a district court's ruling on hearsay evidence, we review the legal questions required "to make the determination of admissibility for correctness," "the questions of fact for clear error," and the "ruling on admissibility for abuse of discretion." *State v. Workman*, 2005 UT 66, ¶ 10, 122 P.3d 639.

## ANALYSIS

¶49 The Confrontation Clause, found in the Sixth Amendment of the United States Constitution, grants all criminal defendants the right "to be confronted with the witnesses against" them. U.S. CONST. amend. VI. "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004).

¶50 In *Crawford*, the United States Supreme Court examined the historical underpinnings of the Confrontation Clause. The Court noted founding-era concerns with inquisitorial practices of some civil-law pretrial examination procedures. *See id.* at 47–50. Those practices included "routinely [taking] testimony by deposition or private judicial examination." *Id.* at 47–48. The statements given by witnesses during these pretrial examinations were then read aloud in court as a replacement for live testimony. *Id.* at 43. By not calling the witness to testify, the accused was denied an opportunity to test the veracity of the testimony through cross-examination. The Court cited historical evidence suggesting that "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," was "the principal evil at which the Confrontation Clause was directed." *Id.* at 50.

¶51 Before *Crawford*, it had been generally accepted that the Confrontation Clause guaranteed only a right to cross-examine witnesses at trial and that the admissibility of pretrial statements was governed entirely by hearsay rules. But the Court rejected that view: "Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." *Id.* at 51.

¶52 Still, the Court recognized that "not all hearsay implicates the Sixth Amendment's core concerns." *Id.* The Court distinguished between "testimonial statements," to which the confrontation right applies, and nontestimonial statements, subject only to traditional hearsay rules. *Id.* The Court asserted that the distinction was rooted not only in the history but also in the text of the Confrontation Clause itself. *Id.* The Clause, it explained, "applies to witnesses against the accused—in other words, those who bear testimony." *Id.* (cleaned up). And "testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (cleaned up). Thus, the Court reasoned, "an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* (cleaned up). Because the latter hearsay "bears little resemblance to the civil-law abuses the Confrontation Clause targeted," *id.*, its admissibility turns on whether it is deemed sufficiently reliable under our rules of evidence. "On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them." *Id.*

¶53 Post-*Crawford*, determining the admissibility of out-of-court statements is a two-step process. "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. Otherwise, the admission of testimonial statements at trial violates a defendant's constitutional right to confrontation. But where nontestimonial hearsay is at issue, the rules of evidence govern whether the statements are admissible. *Id.*

¶54 The *Crawford* Court declined to adopt a precise definition of "testimonial statements." *Id.* But it held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

¶55 Later decisions have held that whether a given statement is testimonial or nontestimonial depends on the primary purpose of the statement. *See generally Ohio v. Clark*, 576 U.S. 237 (2015). Statements are testimonial if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 244 (cleaned up). But if the primary purpose of the exchange "is not to create a record for

trial," the resulting statements are "not within the scope of the Confrontation Clause." *Id.* (cleaned up). In determining primary purpose, courts "must consider all of the relevant circumstances." *Id.* (cleaned up). "In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.* at 245 (cleaned up).

¶56 In this case, Najera has challenged the admissibility of two sets of out-of-court statements that Beth made on the night of the alleged assault—statements first to the officer and later to the nurse. We will begin by addressing Beth's statements to the officer before turning to those she made to the nurse. For each set of statements, we apply the framework established in *Crawford* by first determining whether the statements are testimonial and must be excluded under the Confrontation Clause. If the statements are nontestimonial, we then analyze whether those statements are admissible hearsay under our rules of evidence. For the reasons explained below, we conclude that the statements to both the officer and the nurse are nontestimonial and that the district court acted within its discretion in admitting each set of statements under an exception to the rule against hearsay.

## I. STATEMENTS TO THE OFFICER

¶57 On appeal, Najera argues that the district court erred by determining that the primary purpose of the officer's interaction with Beth was to address an ongoing emergency, thereby rendering her statements nontestimonial. Najera contends that "the court stretched the notion of an ongoing emergency too far" by treating the entire time a perpetrator is "on the loose" as an emergency. If we reject that argument, Najera argues that the district court also erred when it determined that Beth's statements to the officer were admissible under the excited utterance exception to the hearsay rule.

¶58 We begin with our analysis of whether the statements were testimonial and thus barred by the Confrontation Clause. We conclude that the statements are nontestimonial because, when viewed objectively, the primary purpose of the conversation between Beth and the officer was not to elicit statements for use in a future prosecution. We then turn to the application of our hearsay rules and conclude that the district court did not abuse its discretion in admitting the statements under the excited utterance exception.

A. *The Admission of Beth's Statements to the Officer Does Not Violate the Confrontation Clause Because the Primary Purpose of the Interaction Was Not To Gather Evidence for Later Prosecution*

¶59  The district court ruled that the statements Beth made to the officer were nontestimonial because "the primary purpose of talking to [Beth] was not to create an out-of-court-substitute for trial testimony . . . but to address an ongoing emergency." Najera argues that the district court erred in this determination because "the circumstances surrounding [Beth's] interview belied the notion that an ongoing emergency existed."

¶60 But the presence of an ongoing emergency is not dispositive; it is just one circumstance in which "a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

¶61  The concept of a so-called "ongoing emergency exception" to the Confrontation Clause emerged from the United States Supreme Court's opinion in *Davis v. Washington*, 547 U.S. 813 (2006). That opinion resolved a pair of cases involving domestic violence.

¶62  The first case involved the admission of statements made during a 911 call. *Id.* at 817. The 911 dispatcher received a call, but the caller hung up before saying anything. *Id.* The dispatcher called back and asked the woman who answered what was going on. The woman responded, "He's here jumpin' on me again." *Id.* The dispatcher asked about her location and then inquired whether there were any weapons. *Id.* The woman replied, "No. He's usin' his fists." *Id.* As the dispatcher asked additional questions, the woman provided the man's name and other identifying information and explained the context of the assault. *Id.* at 818. The man was arrested and charged, but when the woman failed to show up for trial, the recording of the 911 call was admitted. *Id.* at 818–19.

¶63  The statements in the second case were made to officers at the scene of a domestic disturbance. *Id.* at 819. When the officers arrived, they first spoke with the wife who was outside. *Id.* She told them "nothing was the matter" and gave them permission to enter the home. *Id.* (cleaned up). The officers then spoke with the husband who told them "that he and his wife had been in an argument but everything was fine now and the argument never

18

became physical." *Id.* (cleaned up). Some of the officers stayed with the husband while others spoke to the wife in a separate room and asked her again about what had happened. *Id.* After hearing her account, the officers asked her to fill out a battery affidavit in which she accused the husband of domestic violence. *Id.* at 820. The husband was charged, but the wife did not appear to testify at trial. *Id.* The court admitted the wife's affidavit into evidence and allowed an officer to testify about her oral statements. *Id.*

¶64 Both sets of statements were made to law enforcement, and *Crawford* had been understood to treat such statements as prototypically testimonial. But the *Davis* Court held that the wife's statements to the responding officers were testimonial, while the woman's statements on the 911 call were not. The Court explained, "When we said in *Crawford* that interrogations by law enforcement officers fall squarely within the class of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Id.* at 826 (cleaned up). "A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827 (cleaned up).

¶65 The Court determined that the circumstances of the 911 call in the first case "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828. The caller "simply was not acting as a *witness;* she was not *testifying.*" *Id.* Therefore, it was not the type of testimonial hearsay prohibited by the Confrontation Clause.

¶66 In contrast, the statements of the wife in the second case were statements made "under official interrogation," which are "inherently testimonial." *Id.* at 830. While not made in the context of a formal, stationhouse interrogation, the wife's statements were similar to those in *Crawford* in that they "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id.* "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." *Id.* Such statements "are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination." *Id.*

¶67 The Court once again declined to define what would constitute a testimonial statement outside the context of the case before it, but said that "it suffices to decide the present cases to hold as follows":

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

¶68 That passage from *Davis* has been misconstrued as creating a "ongoing emergency exception" that must be met before statements to law enforcement can be deemed nontestimonial. But the *Davis* Court was not "attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial." *Id.* It was simply deciding the facts before it. It held that statements are nontestimonial when the primary purpose is something other than establishing facts for a later prosecution. And it expressly declined to limit the circumstances in which statements to law enforcement might be characterized as nontestimonial. *See Bryant*, 562 U.S. at 355 ("We thus made clear in *Davis* that not all those questioned by the police are witnesses and not all interrogations by law enforcement officers are subject to the Confrontation Clause." (cleaned up)).

¶69 The Court returned to the subject again in *Michigan v. Bryant*. In that case, police responded to a call that a man had been shot. *Id.* at 349. They found the man lying next to his car with a gunshot wound to his stomach, struggling to speak. *Id.* "The police asked him 'what had happened, who had shot him, and where the shooting had occurred.'" *Id.* The man identified the shooter as "Rick" and explained where and how he had been shot. *Id.* The conversation lasted five to ten minutes before the man was taken to the hospital where he died within hours. *Id.* Police immediately went to the location of the shooting and found blood and a bullet as well as the wallet of Richard Bryant, the alleged shooter. *Id.* at

350. At trial, the officer who spoke with the dying man testified about what the man had told him. *Id.*

¶70 The Court held "that the circumstances of the interaction between [the man] and the police objectively indicate[d] that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency" and therefore, the man's statements were nontestimonial, and their admission at trial did not violate the Confrontation Clause. *Id.* at 349 (cleaned up). But the Court once again clarified that the existence or absence of an ongoing emergency is not "dispositive of the testimonial inquiry." *Id.* at 366. And it emphasized that "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.*

¶71 The takeaway is that the presence of an ongoing emergency does not determine whether statements made to law enforcement are testimonial. The determinative factor is the primary purpose of the questioning. "When, as in *Davis,* the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause." *Id.* at 358. But that does not mean that all other statements to law enforcement are testimonial. To the contrary, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* Even statements made during an ongoing emergency will be testimonial if the primary purpose was to collect evidence for trial. And the inverse is also true: the absence of an ongoing emergency does not render statements to law enforcement testimonial if they were not elicited to create a record for trial.

¶72 To determine the primary purpose of a police interrogation, courts must "objectively evaluate the circumstances." *Id.* at 359. An "objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the primary purpose of the interrogation." *Id.* at 360 (cleaned up). To complete this objective analysis, "circumstances in which an encounter occurs—*e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards"—must be considered as they "are clearly matters of objective fact." *Id.* The "relevant inquiry" is the objective analysis of the "statements and

actions of the parties" rather than "the subjective or actual purpose of the individuals involved in a particular encounter." *Id.* Courts should consider "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.*

¶73 With this understanding of the governing law, we turn to whether, in light of all the circumstances viewed objectively, the primary purpose of the officer's conversation with Beth was to create an out-of-court substitute for trial testimony. The nature and proximity of the crime, the informality of the encounter, Beth's physical and emotional condition, and the nature of the questioning, all suggest that the primary purpose of the encounter was to assess whether immediate action was required to protect the public, not to obtain evidence for Najera's prosecution.

### 1. The Need for a Threat Assessment

¶74 In cases involving a victim's statements to law enforcement, "[t]he existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation." *Bryant*, 562 U.S. at 370. But, as explained above, whether the statements are testimonial does not depend on whether the primary purpose of the encounter was to address an ongoing emergency. The test is whether, viewed objectively, the primary purpose of the encounter was something other than eliciting the witness's statement for use in a prosecution.

¶75 In *Bryant*, the Court noted that the officers responding to a call that a man had been shot "did not know why, where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred." *Id.* at 375–76. When they arrived, they asked the victim "the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public." *Id.* at 376 (cleaned up); *see also State v. Ohlson*, 168 P.3d 1273, 1281 (Wash. 2007) (en banc) (holding that a juvenile's statements to an officer were nontestimonial where the officer's "initial inquiries sought information essential to determining whether the situation

presented . . . ongoing dangers or threats" at least until the officer "completed her initial triage of the situation").

¶76 Similarly, the officer who responded to the hospital did not know why, when, or where the alleged rape had occurred. The officer knew that Beth had gone to the emergency room and told hospital staff that she had been raped. Beth appeared disheveled and had a cut lip, suggesting that the alleged assailant had used force. The officer learned within the first two minutes of the conversation that the alleged rape had occurred right outside the hospital. The officer also learned that the assailant was a stranger to Beth and that his location was unknown.

¶77 Although the potential risk to the public may have been less than the risk posed by the shooter in *Bryant*, the facts nevertheless suggested that a woman had been violently raped by a stranger who was on the loose in the immediate area surrounding the hospital. Regardless of whether the circumstances rose to the level of an "ongoing emergency," the primary purpose of talking to Beth was not to discover what had already occurred so that the assailant could be prosecuted. It was to assess the current situation so that the officer could determine whether immediate steps needed to be taken to address any ongoing threat.

### 2. The Formality of the Interrogation

¶78 Another important factor in a primary purpose inquiry is the level of formality in an encounter between a victim and police. *Bryant*, 562 U.S. at 366. While "formality is not the sole touchstone of our primary purpose inquiry," it can suggest "the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* (cleaned up). "The most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Id.* at 358.

¶79 In *Bryant*, the Court found that the situation in which the police questioned the gunshot victim was "more similar, though not identical, to the informal, harried 911 call in *Davis* than to the structured, station-house interview in *Crawford*." *Id.* at 377. The Court noted that "the situation was fluid and somewhat confused," with officers arriving at different times and each asking the victim what happened. *Id.* "The informality suggest[ed] that the interrogators' primary purpose was simply to address what they

perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the victim] to or focused him on the possible future prosecutorial use of his statements." *Id.*

¶80 As in *Davis* and *Bryant*, the encounter between Beth and the officer bore little resemblance to the stationhouse interview in *Crawford*. The officer approached Beth in a hospital emergency room shortly after her arrival. He could see that she was visibly distraught and did not ask to interview her or take her statement at that time. Instead, he told her that he just needed basic information so he could report back to his supervisor. Certainly, "the circumstances lacked any formality that would have alerted [Beth] to or focused [her] on the possible future prosecutorial use of [her] statements." *See id.* The informality suggested that the officer's primary purpose was to gather basic information to assess the situation, not to take Beth's statement for use in a future prosecution. Such "initial inquiries . . . *often* produce nontestimonial statements." *Id.* (cleaned up).

### 3. The Declarant's Physical Condition

¶81 Beth's physical condition is also relevant in determining whether the primary purpose of the encounter was to gather evidence. "The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Bryant*, 562 U.S. at 364–65. Furthermore, a victim's medical state "provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public." *Id.* at 365.

¶82 Here, Beth was injured and had not yet been evaluated or treated. She was dirty, with debris in her hair, and had not yet been allowed to use the bathroom. She was visibly in shock and still processing what had just happened to her. She continually paced the room, cried, gagged, hid her face, and spoke in fits and starts, leaving sentences unfinished. She did not appear to possess the "ability . . . to have any purpose at all in responding to police questions." *Id.*

¶83 Taking Beth's injuries into account "does not transform this objective inquiry into a subjective one." *Id.* at 369. "The inquiry is still objective because it focuses on the understanding and

purpose of a reasonable victim in the circumstances of the actual victim—circumstances that prominently include the victim's physical state." *Id.*

¶84 Considering Beth's condition also places otherwise misleading facts into perspective. At first blush, the length of time Beth spoke with the officer and the amount of detail she shared might suggest that she was attempting to provide a statement for use in a future prosecution. But viewing the video of the encounter reveals a decidedly different picture. It captures a traumatized woman trying to come to terms with what has happened to her. Much of the time, she seems to forget that the officer is in the room and appears to be talking to herself, thinking out loud as she pieces together that night's events. As she recalls details, she gasps, dry heaves, begins to cry, and appears to disassociate. The officer is not directing an interview, but merely standing by, offering occasional words of reassurance and waiting for an opportunity to extricate himself and report back to his supervisor. Viewing the encounter as a whole, Beth's answers appear to "be simply reflexive," *id.*, further supporting the idea that these were not the kind of testimonial statements that the Confrontation Clause forbids.

4. The Nature of the Questioning

¶85 "In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Id.* at 367–68. Statements are more likely to be nontestimonial when "the nature of what was asked and answered[,] . . . viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Davis*, 547 U.S. at 827.

¶86 In *Bryant*, for example, the officers who arrived at the scene asked the gunshot victim "what had happened, who had shot him, and where the shooting had occurred." 562 U.S. at 349 (cleaned up). The Court explained that such "initial inquiries may *often* produce nontestimonial statements." *Id.* at 377 (cleaned up).

¶87 Here, after asking for Beth's name and date of birth, the officer asked only three relevant questions: (1) "Where did it occur at, the incident?" (2) "Do you know who it was?" and (3) "Do you

have a—do you know a description?"[5] The limited nature of those questions objectively indicates that the officer was attempting to assess whether the assailant posed a safety risk to those nearby and who police should be looking for to resolve that risk. If conducting an interview to aid a future prosecution, one would expect the officer to ask far more questions—or any at all for that matter—about what had occurred. Those objective facts suggest that this was not such an interview, but merely triage.

¶88 Beth was never asked what happened. The officer did not inquire about facts that would have gone to the elements of the crimes, such as whether the perpetrator was armed, used force or threats or force, inflicted any injuries, or committed certain types of sexual acts. While Beth volunteered some of that information, she did so while "trying to remember" where the crime occurred and what the perpetrator looked like. The objective circumstances in which the statements were made show that the primary purpose was not to establish past facts for criminal prosecution. Therefore, we hold that the statements Beth made to the officer were not testimonial. Because the Confrontation Clause does not apply to nontestimonial statements, their admissibility depends on the rules of evidence.

### B. Beth's Statements to the Officer Are Admissible Hearsay Because They Were Excited Utterances

¶89 Najera next argues that the district court abused its discretion in admitting Beth's statements to the officer under a hearsay exception. The statements Beth made to the officer are hearsay because they were made outside of court and the State wishes to offer them as proof that the things Beth described are true. *See* UTAH R. EVID. 801(c). As a general matter, hearsay is inadmissible, *see id.* R. 802, but there are multiple exceptions to the rule against hearsay, *State v. Green*, 2023 UT 10, ¶ 83, 532 P.3d 930. One of those exceptions is rule 803(2), which applies to excited utterances. *See* UTAH R. EVID. 803(2).

¶90 Rule 803(2) defines excited utterances as statements "relating to a startling event or condition, made while the declarant

---

[5] While the officer asked several other questions, those questions were not substantive and consisted entirely of clarifying questions as well as inquiries about the victim's well-being as the conversation proceeded.

was under the stress of excitement that it caused." *Id.* "The generally accepted rationale for the exception is that declarations made during a state of excitement temporarily still a declarant's capacity to reflect and thereby produce utterances free of conscious fabrication." *State v. Smith*, 909 P.2d 236, 239–40 (Utah 1995). Three conditions must be met to satisfy the exception: "(1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition." *State v. Cude*, 784 P.2d 1197, 1200 (Utah 1989) (cleaned up).

¶91 Here, it is clear both that a startling event occurred—the alleged rape—and that the statements the court ruled admissible related to that startling event. The only question before us is whether the statements were made while Beth "was under the stress of [the] excitement caused by" the alleged assault.

¶92 To satisfy this condition, "the declarant's declaration must be a spontaneous reaction to the event or condition, not the result of reflective thought." *Smith*, 909 P.2d at 239. "The justification for the exception disappears as the emotional excitement of the declarant subsides and the declarant's capacity for reflection revives." *Id.* at 240 (cleaned up). However, "the statement need not be strictly contemporaneous with the startling event to be spontaneous, as is the case with the 'present sense impression' exception." *Id.* (cleaned up); *see also* UTAH R. EVID. 803(1). Ultimately,

> the determinative factor, subject to no precise or absolute standard, is whether the state of the declarant's mind was such that because of a high degree of emotional arousal, the declaration was spontaneous in the sense that the declarant's emotional arousal or excitement at the time of the statement strongly suggested that the statement came purely from the declarant's memory, unchanged or distorted by a consideration of the consequences of the statement.

*Smith*, 909 P.2d at 240.

¶93 Our court has considered a number of factors when determining whether the stress of the event stilled the declarant's capacity for reflective thought. Those factors include "the declarant's age, the declarant's physical and mental condition, the

circumstances and nature of the startling event, the subject matter of the statement, and the time lapse between the event and the utterance." *Id.*

¶94 We begin with Beth's physical and mental condition. "[W]hat is critical" is that the declarant exhibits "a mental state that tends to block reflection and the reasoning process." *Id.* at 241. After reviewing Beth's demeanor and responses on the video of her conversation with the officer, we conclude that "surely occurred here." *See id.* On the video, Beth appears to be in shock and processing in real time what had happened to her. Her reactions suggest that she is recalling snapshots of the alleged rape as she speaks. As bits and pieces come back to her, she gasps, gags, dry heaves, cries, hides her face, and tells herself that this is not happening to her. Her statements are spontaneous and largely unprompted and spill out as a stream of consciousness. The evidence suggests that Beth's statements sprang purely from memory "unchanged or distorted by a consideration of the consequences" and "made by free recall." *Id.* at 240–41.

¶95 Despite the evidence of Beth's apparent distress, Najera asserts that the excitement of the event had subsided by the time Beth spoke to the officer an hour and a half later. "Generally, the shorter the gap between the startling event and the utterance, the more reliable the statement since the excitement of the event is unlikely to have yielded to reasoned reflection and conscious fabrication." *Cude*, 784 P.2d at 1200. But "the length of time between the event and the declaration is not a yardstick by which reliability can be measured." *Id.* Instead, "the more accurate gauge—and the more difficult to read—is the state of the declarant's mind." *Id.*

¶96 To be sure, the time elapsed between the alleged rape and Beth's statements to the officer might suggest that she had time to reflect on the events. But we have strong video evidence of Beth's state of mind at the time of the statements. The manner in which Beth appeared to suddenly recall details and her physical reactions to those memories support the district court's conclusion that she was still under the emotional stress of the event and had no capacity for reflection between the alleged rape and her statements to the officer.

¶97 Najera also points out that there are moments in the video where Beth appears outwardly calm, suggesting that she was no longer in a high state of emotional arousal. But those moments could suggest, alternatively, that Beth is in a state of shock. At

times, she appears to be disassociating, insisting that this is not happening and "This isn't me." *See Smith*, 909 P.2d at 241 (holding that victim's statements to a child abuse investigator within three hours of assault were admissible where victim was bleeding, in pain, and in a "dissociative state" of "psychic shock"). She exhibits a flat affect and periodically stares into space before appearing to jolt back to awareness. The sudden shifts in emotion only serve to underscore the extreme stress she is still under from the event.

¶98 Given the evidence documenting Beth's condition during the interaction with the officer, the district court did not abuse its discretion in ruling that Beth's statements to him were excited utterances under rule 803(2). On this record, "there is no reason to believe that [Beth's] responses were anything other than an accurate report of her memory of very recent events that were accurately perceived." *Id.* at 243. Thus, we affirm the district court's ruling admitting Beth's statements to the officer.

## II. STATEMENTS TO THE NURSE

¶99 Najera also argues that the district court erred by determining that the statements Beth made to the nurse were nontestimonial because, in his view, the "primary purpose was to establish past events and preserve evidence for future prosecution." Both parties recognize that SANE exams have dual purposes. But they disagree over which purpose is the primary one: Najera contends that "the criminal-investigation aspect of a SANE exam so pervades the exam" that the "exam's primary purpose is testimonial" and the State contends that the "overriding purpose is to provide medical care." If we conclude that the statements are nontestimonial, Najera argues that the district court erred when it determined that Beth's statements to the nurse were admissible under the statement for medical diagnosis or treatment exception to the rule against hearsay.

¶100 Again, we start with an analysis of whether the statements are testimonial. Because we conclude that they are not, we turn to whether the statements were properly admitted under our rules of evidence. We conclude that the district court acted within its discretion in admitting the statements under the medical treatment hearsay exception.

A. *Admission of Beth's Statements to the Nurse Does Not Violate the Confrontation Clause Because the Primary Purpose Was Not To Create Evidence for Prosecution*

¶101 The district court ruled that the statements Beth made to the nurse were nontestimonial because the "primary purpose of the SANE examination and report [was] for the purposes of diagnosis and treatment." Although Najera agrees that medical care is one purpose of a SANE exam, he pushes back on the district court's conclusion that it is the primary purpose.

¶102 The United States Supreme Court has never applied the Confrontation Clause to SANEs. Various courts have reached different conclusions on the question of whether a victim's statements to a SANE are testimonial or nontestimonial. But "what seems consistent in nearly all cases is the courts' use of case-specific analysis of the challenged statements based on the totality of the underlying circumstances to determine the testimonial or nontestimonial nature of the statements." *State v. Miller*, 264 P.3d 461, 482 (Kan. 2011).

¶103 These cases illustrate that statements made during a SANE exam are not categorically testimonial or nontestimonial. Not all SANE exams are alike. A case-by-case approach is consistent with the Supreme Court's instruction that "courts should look to all of the relevant circumstances" when "determining whether a declarant's statements are testimonial." *Michigan v. Bryant*, 562 U.S. 344, 369 (2011); *see also Ohio v. Clark*, 576 U.S. 237, 245 (2015) ("The question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." (cleaned up)).

¶104 The courts that have addressed this question have relied on various factors to evaluate whether a victim's statements during a particular SANE exam are testimonial. Among other things, courts have considered the presence and involvement of law enforcement, the time elapsed since the assault and the need for medical treatment, the formality of the exchange, and whether the statements and actions of the participants objectively reflect a focus on the prosecution of a crime.[6] While those same factors may not

---

[6] *See, e.g., State v. Tsosie*, 516 P.3d 1116, 1140 (N.M. 2022) ("The relevant surrounding circumstances here include the time elapsed

(continued . . .)

between the alleged assault and the SANE exam, the location of the SANE exam, the role of law enforcement in the SANE exam, and the identity of the SANE nurse as [her] dual role bears on the challenged statements."); *State v. Miller*, 264 P.3d 461, 486 (Kan. 2011) ("[W]ith the guidance of the United States Supreme Court in mind, we turn to an objective analysis of the circumstances of [the victim's] encounter with the SANE, considering factors such as whether the SANE was a State actor or agent, whether there was an ongoing emergency, whether the encounter was formal, and whether the statements and actions of both [the victim] and the SANE reflect a primary purpose focusing on the later prosecution of a crime."); *Hartsfield v. Commonwealth*, 277 S.W.3d 239, 244 (Ky. 2009) ("In *Davis*, the Court cited factors that are instructive in characterizing a statement as testimonial, including: whether the events spoken about were actually happening, or were past events; the presence of an ongoing emergency; whether what was asked and answered was for the purpose of resolving the situation, rather than simply learning what had happened in the past; and, finally, the level of formality in the interview."); *State v. Nelson*, 954 N.W.2d 11, 19 (Wis. Ct. App. 2020) ("Some factors for determining the primary purpose of a particular statement include: (1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant and (4) the context in which the statement was given." (cleaned up)); *Thompson v. State*, 438 P.3d 373, 377 (Okla. Crim. App. 2019) ("Courts considering the issue have focused on various factors that are relevant to the primary purpose determination, including *inter alia*: 1) the objective intent of the SANE nurse and the alleged victim; 2) the classification of the SANE nurse as either a medical professional or a law enforcement agent; 3) the setting of the exam; 4) whether the alleged victim's statement contained specific accusations; 5) the amount of time that elapsed between the exam and the assault; 6) whether the SANE nurse participated in the medical treatment of the victim; 7) whether a law enforcement officer was present; 8) the primacy of medical purpose; and 9) the intention underlying the victim's answers."); *State v. Hill*, 336 P.3d 1283, 1287 (Ariz. Ct. App. 2014) ("Other courts examining similar exchanges under the Confrontation Clause have looked to where the examination took place, the victim's medical condition,

(continued . . .)

be relevant in every case, we find them useful in structuring our analysis here.

### 1. Presence and Involvement of Law Enforcement

¶105  An alleged victim's statements during a SANE exam are more likely to be testimonial if law enforcement officers are present during the exam, if officers engage in direct questioning, or if the interview is structured to gather evidence for prosecution.[7] Statements made to persons other than law enforcement "are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246. Because "law enforcement officers are principally charged with uncovering and prosecuting criminal behavior[,] . . . statements made to them are much more likely to be used as a substitute for trial testimony." *State v. Burke*, 478 P.3d 1096, 1107 (Wash. 2021) (en banc) (cleaned up).

¶106  In *State v. Bennington*, for example, the Kansas Supreme Court held that a victim's statements during a SANE exam were testimonial, and their admission violated the Confrontation Clause, in part, because of the presence of a law enforcement officer. 264 P.3d 440, 453–54 (Kan. 2011). In that case, while the nurse was

---

whether law enforcement officers were present and the formality of the exchange.").

[7] *See, e.g.*, *State v. Swartz*, 17 N.W.3d 174, 187–88 (Neb. 2025) ("[C]ourts have excluded a SANE report, reasoning that a victim's statements to a sexual assault examiner were testimonial and violate the confrontation clause because of the examiner's relationship with police or the involvement of the police in the examination process, coupled with the absence of any need for, or provision of, medical treatment during the examination."); *Miller*, 264 P.3d at 482 ("[I]f a law enforcement officer participates in the questioning, there is a strong trend toward finding the victim's statements testimonial."); *Hobgood v. State*, 926 So. 2d 847, 852 (Miss. 2006) ("[A] statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused."); *Hill*, 336 P.3d at 1289 ("Courts also have refused to admit statements made by a victim during a forensic medical examination when there is evidence of heightened police involvement—when, for example, an officer was present during the examination, or the examination was recorded for law enforcement purposes.").

taking a history from the victim before beginning the physical exam, a law enforcement officer was present and "asked [the victim] a few specific questions." *Id.* at 452. The nurse's report did not distinguish statements the victim made to the nurse from statements made to the officer. *Id.* The court explained that "the presence of the law enforcement officer during the initial taking of a history from [the victim] blurs the 'primary purpose' of the interview." *Id.* at 453.

¶107 In *State v. Cannon*, the Tennessee Supreme Court similarly held that statements made to a nurse employed by the Sexual Assault Crisis Center were testimonial, in part, because of the presence and involvement of a detective. 254 S.W.3d 287, 293, 305 (Tenn. 2008). In that case, both the detective and the nurse questioned the victim after the victim had already been examined in the emergency room. *Id.* at 305. Additionally, the nurse "had been instructed by speakers from law enforcement agencies and from the district attorney's office on . . . how to ask questions," she "often testifie[d] at trials in her capacity as a sexual assault nurse examiner," and she described her interview "as an 'investigation' designed to gain information about the rape." *Id.* Based on these circumstances, the court concluded that "the primary purpose of the interrogation was 'to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).[8]

¶108 On the other hand, when law enforcement officers are not present during the exam or when their role is minimal, a victim's statements during a SANE exam are less likely to be deemed testimonial. "Statements made to someone who is not principally

---

[8] *See also State v. Hooper*, 176 P.3d 911, 917 (Idaho 2007) (holding that a child victim's statements to a nurse were testimonial where a detective was watching to ensure the nurse "remember[ed] to ask all the questions," the nurse "consulted with the detective" near the end of the interview, and the nurse then returned to ask "questions regarding specific details"); *State v. Gatewood*, No. E2017-00653-CCA-R9-CD, 2018 WL 1391812, at *7 (Tenn. Crim. App. Mar. 20, 2018) (holding that a child victim's statements to a nurse practitioner were testimonial where the child went to the Children's Advocacy Center "at the direction of the police" and the nurse "consulted" with police "while the victim was at the Children's Advocacy Center").

charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Clark*, 576 U.S. at 249; *accord Burke*, 478 P.3d at 1108 ("Statements made to witnesses other than law enforcement officers are far more likely to be made for reasons not primarily associated with criminal prosecution.").

¶109  For example, in *State v. Hill*, the Arizona Court of Appeals held that a victim's statements to a nurse who was trained to perform forensic exams were nontestimonial, in part, because "[n]o law enforcement officer was present during any part of the examination." 336 P.3d 1283, 1284, 1289 (Ariz. Ct. App. 2014). The court reasoned, "The objective circumstances of the exchange that produced the statement . . . indicate that its primary purpose was medical treatment, not the collection of evidence of a crime." *Id.* at 1290.

¶110  Similarly, in *People v. Vigil*, the Colorado Supreme Court, sitting en banc, held that a child victim's statements to a doctor were nontestimonial, in part, because the law enforcement officer "was not involved in the medical examination or in the room when the doctor performed the examination." 127 P.3d 916, 924 (Colo. 2006) (en banc). The court acknowledged that "the doctor was a member of a child protection team," but it reasoned that this fact "does not, in and of itself, make him a government official absent a more direct and controlling police presence." *Id.* at 923–24.[9]

---

[9] *See also Tsosie*, 516 P.3d at 1141 (holding that "the degree of involvement of law enforcement in the SANE exam here does not weigh toward a testimonial primary purpose" because the nurse testified that "law enforcement officers are not allowed in the SANE exam," that "SANE nurses 'do not work for the police,'" and that the advocacy center the nurse did work for was "a 'nonprofit and . . . separate' from the police"); *Burke*, 478 P.3d at 1112 (holding that most of a victim's statements were nontestimonial where "[n]o member of law enforcement was present during the exam, and [the nurse] did not take any direction from law enforcement"); *State v. Krasky*, 736 N.W.2d 636, 641–43 (Minn. 2007) (en banc) (holding that a child victim's statements to a nurse were nontestimonial where the victim's assessment "was conducted at a children's hospital rather than at a law enforcement center, and no law enforcement officer was present"); *State v. Hilson*, 829 N.W.2d 190 (Table), No.

(continued . . .)

¶111 Turning to the facts of this case, the absence of law enforcement presence or involvement in Beth's SANE exam weighs in favor of concluding that Beth's statements to the nurse were nontestimonial. The defense's SANE expert testified that law enforcement officers are not ordinarily present in the room during a SANE exam, and there is no evidence to suggest that the nurse deviated from that standard practice here. Nor is there any evidence that law enforcement officers directed the nurse in questioning Beth. Although law enforcement has been involved in the development and revision of Utah's sexual assault examination report form, so have other stakeholders, including SANEs, the forensic laboratory, and the Utah Coalition Against Sexual Assault. Unlike those cases in which law enforcement played a direct role in the questioning, police were not directly involved in questioning Beth.

## 2. Time Elapsed and Need for Medical Treatment

¶112 Other courts have recognized that when the exam takes place after there is no longer a need for medical treatment, the questions asked during a SANE exam are more likely to be for the primary purpose of creating statements for use at trial. *See, e.g.*, *Miller*, 264 P.3d at 482 ("[W]hen there is little to no medical purpose for the examination and the interview is conducted by a sexual assault nurse primarily for forensic purposes, the conclusion is that the victim's statements are testimonial."). For example, in *State v. Hooper*, the Idaho Supreme Court held that a child victim's statements to a nurse were testimonial because the nurse "did not ask any questions regarding [the victim's] medical condition" and the nurse's "interview took place after a medical assessment and separately from the medical assessment." 176 P.3d 911, 917–18 (Idaho 2007).

¶113 Whether there is a medical need for the exam often depends on how much time has passed since the alleged assault. In *State v. Romero*, for instance, the New Mexico Supreme Court held that the victim's statement during a SANE interview was testimonial, in part, because "the examination occurred several weeks after the assault." 156 P.3d 694, 699 (N.M. 2007). Similarly,

10-0665, 2013 WL 541621, at *2 (Iowa Ct. App. Feb. 13, 2013) (holding that statements made to a nurse were nontestimonial where "police were not present and did not provide questions for the nurse to ask").

in *Hernandez v. State*, the District Court of Appeal of Florida held that a child victim's statements to a nurse were testimonial, in part, because the "alleged sexual abuse had occurred one week earlier." 946 So. 2d 1270, 1271, 1282 (Fla. Dist. Ct. App. 2007). The court reasoned that the nurse's questioning was not "to enable law enforcement to meet an ongoing emergency." *Id.* Rather, the primary purpose "was to obtain facts about past events pertinent to the prosecution of [the defendant]." *Id.*[10]

¶114 Conversely, if there is a need for immediate medical care and the questions asked are necessary for medical treatment, statements made to a SANE are less likely to be deemed testimonial. *See, e.g.*, *State v. Tsosie*, 516 P.3d 1116, 1140 (N.M. 2022) ("[T]he close proximity in time of the SANE exam to the alleged predicate assault weighs toward a nontestimonial primary purpose."); *Miller*, 264 P.3d at 482 ("[G]enerally where there is a clear medical purpose to the examination—often evidenced by the treating physician's or nurse's testimony that the question of 'what happened' was necessary for treatment of medical issues—the statements are nontestimonial even if there is a secondary purpose of preserving evidence."). In particular, "a victim's statement to a medical professional is more likely to be non-testimonial when the victim is examined in a hospital emergency room, where the medical necessity of the examination presumably is more pronounced." *Hill*, 336 P.3d at 1287.

¶115 For example, in *State v. Slater*, the Connecticut Supreme Court held that a victim's statements to an emergency room physician and nurse who administered a rape kit were nontestimonial because the victim was in need of medical attention. 939 A.2d 1105, 1119 (Conn. 2008). The court explained that "[a] rape victim is necessarily in need of medical attention" and that "[w]hen such a victim is brought to a hospital, even by the police, we expect

---

[10] *See also People v. Spicer*, 884 N.E.2d 675, 687 (Ill. App. Ct. 2007) (holding that a victim's statement to a doctor was testimonial where "the victim had stated that she did not want to see a doctor and the police waited approximately seven hours before transporting her to a hospital"); *cf. Commonwealth v. Howard*, No. 769 WDA 2016, 2017 WL 902257, at **3, 5 (Pa. Super. Ct. Mar. 7, 2017) (holding that a child victim's statements to a SANE were nontestimonial even though the exam occurred three days after her initial disclosure).

that his or her most pressing concern is getting medical attention and not providing a record of facts, despite the administration of a rape kit." *Id.*[11]

¶116 Here, Beth's medical condition and the timing of the exam weigh in favor of concluding that her statements to the nurse were nontestimonial. Beth was allegedly raped near the hospital and walked into the emergency room shortly thereafter. This is not a case in which a victim later reports a sexual assault to the police and is then referred for a SANE exam for the purpose of creating evidence to use in prosecuting the crime. Beth sought medical treatment by going to the emergency room. When the exam started, Beth had only been at the hospital for about an hour and a half and had not yet received any medical treatment. The nurse found several injuries on Beth's face, head, chest, back, arm, leg, and buttocks and administered the medications Beth needed. The timing of the exam and Beth's desire for medical treatment support the conclusion that the primary purpose of the exam was to care for her medical needs, whereas the forensic purpose was secondary.

### 3. Formality of the Exchange

¶117 The Confrontation Clause is primarily concerned with the use of out-of-court statements "in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain

---

[11] *See also Tsosie*, 516 P.3d at 1140–41 (holding that where a SANE exam "occurred in the same night as the alleged assault" the "timing circumstance supports the primary purpose of the SANE exam being nontestimonial"); *Burke*, 478 P.3d at 1111 (holding that "nearly all of the [victim's] statements" were nontestimonial because she "made these statements in a medical exam room in a hospital" and "[s]he needed medical treatment specific to her sexual assault, which [the nurse] provided"); *Thompson*, 438 P.3d at 378 (holding that a victim's statements to a SANE were nontestimonial where the "exam was performed in the emergency room once [the victim's] pain was under control" and "a portion of the exam was devoted to treating the issues associated with the assault"); *Bowers v. Ames*, No. 20-0625, 2022 WL 123507, at *10 (W. Va. Jan. 12, 2022) (holding that a victim's statements were nontestimonial where it was "undisputed that the victim was physically injured and in need of medical assistance," "the victim ultimately received three sutures to repair a tear," and "the victim's statements to the SANE nurse facilitated her treatment").

evidence for trial."[12] *Bryant*, 562 U.S. at 358. If an exchange between an alleged victim and a SANE is formal—meaning that it presents like a structured interview, is videotaped, or uses specific forms or official reports—the victim's statements are more likely to be deemed testimonial. *See id.* at 366.

¶118 For example, in *People v. Vargas*, the California Court of Appeal held that a victim's statements to a nurse were testimonial because they "occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony." 178 Cal. App. 4th 647, 660–62 (2009) (cleaned up). The court explained that the nurse questioned the victim "according to a rigorous, statutorily mandated format designed to have [the victim] describe the specific sexual acts which she was forced to perform." *Id.* at 661. The nurse was also required to complete a mandatory form, which explained that "a separate medical examination for evidence of sexual assault at public expense would be conducted by a physician to discover and preserve evidence of the assault," that the nurse would ask about several categories of sexual assault, and that "the report of the examination and any evidence obtained will be released to law enforcement authorities." *Id.* at 655 (cleaned up); *see also Bennington*, 264 P.3d at 454–55 (holding that the victim's statement to a SANE was testimonial, in part, because "the statement was given in a formal setting," using a questionnaire and procedures dictated by state agencies).

¶119 In this case, the nurse's examination of Beth was guided by a seventeen-page standardized form. If the protocol the nurse followed made the examination objectively more formal than a sexual assault examination by a nurse who was not certified as a SANE, there was no evidence to that effect. To the contrary, the nurse testified that SANEs do the "same things" that an emergency doctor would do when examining an alleged victim of sexual assault and that some of the information on the form would be noted "with any chart." The very circumstances that make SANE exams "more formal are those that also lend credence to the medical purpose—the taking and recording of a medical history

---

[12] The United States Supreme Court has recognized that "at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns," and has "decline[d] to adopt a categorical rule excluding them from the Sixth Amendment's reach." *Ohio v. Clark*, 576 U.S. 237, 246 (2015).

before treatment." *Miller*, 264 P.3d at 489. Viewed from the perspective of an objective participant, the formality attendant to the exam is not markedly different from a standard medical exam where the provider takes a history and notes the patient's responses in the chart. As a result, the level of formality tells us little about whether the primary purpose of the exam is for medical treatment or to aid the criminal prosecution.

### 4. The Statements and Actions of the Participants

¶120  An alleged victim's statement to a SANE is more likely to be deemed testimonial if it was made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 52 (2004) (cleaned up). But if "an objectively reasonable person in the declarant's position would not have believed that his statements to the [SANE] would be available for use at a later trial," the statement is less likely to be deemed testimonial. *See Vigil*, 127 P.3d at 924, 926.

¶121 Where the SANE advises the alleged victim that the examination is not for the purposes of medical treatment, a reasonable observer would understand that the primary purpose of collecting statements is to aid in the prosecution of the offense. For example, the Montana Supreme Court has held that a victim's statements to a SANE were testimonial where "the SANE examination consent form has the patient attest to the fact that they 'understand that this is not a routine medical checkup.'" *State v. Martinez*, 545 P.3d 652, 660–61 (Mont. 2023). The consent form "indicate[d] that the examination [was] done, in part, to 'collect evidence,' take photographs 'to be used as evidence,' and 'release evidence collected and information obtained to law enforcement.'" *Id.* at 661 (cleaned up). And it "specifically state[d] that the examiner will not be held responsible for identifying, diagnosing, or treating any existing medical problems." *Id.* (cleaned up).

¶122  In contrast, in *State v. Stahl*, the Ohio Supreme Court held that a victim's statement to a nurse practitioner was nontestimonial because the victim "could have reasonably believed that . . . the statement would be used primarily for health-care purposes." 855 N.E.2d 834, 846 (Ohio 2006). The victim had already given a statement to an officer at the police station prior to her exam. *Id.* at 845. When she arrived for the exam, she signed a consent form that stated, "I authorize the release of evidence, information (including protected health information), clothing, colposcope photos, and

photography documentation of injuries to a law enforcement agency for use only in the investigation and prosecution of this crime." *Id.* at 837. The court drew a distinction between the victim's expectations with regard to the physical evidence and her statements: "This wording would naturally create a reasonable belief that the [examining] unit will release *physical* evidence to the police and any information resulting from the physical examination. But to a reasonable person, questioning by a nurse or other medical professional during an emergency-room examination would appear to serve a primarily health-care-related function." *Id.* at 846.

¶123 Turning to the facts of Najera's case, there is no evidence that Beth was told that her statements would be turned over to law enforcement. Beth gave the nurse consent to share the evidence collected during the exam with law enforcement, which might lead a reasonable observer to believe that collecting physical evidence and documenting Beth's injuries were for the primary purpose of gathering evidence for trial. But we agree with the Ohio Supreme Court that this would not have informed a reasonable observer that statements to the nurse could be used in a future prosecution.

¶124 The totality of the circumstances would suggest to a reasonable observer that the question-and-answer part of the exam was for the primary purpose of providing medical treatment. At the beginning of the exam, the nurse told Beth that she would "do an exam . . . to just look for any injuries and be able to address any injuries" and would "ask some questions that will help guide [the] exam." The nurse told Beth that she would "treat with medications or do x-rays or anything that might seem necessary towards the end." This exchange would lead a reasonable participant to believe that the primary purpose of eliciting Beth's statements was for medical treatment, not "to establish or prove past events potentially relevant to later criminal prosecution." *See Davis*, 547 U.S. at 822.

¶125 In sum, there is no doubt that the nurse posed questions to Beth, in part, because the form called for those answers. But as discussed in the following section, the nurse testified that each of those questions also had a medical purpose. Viewed objectively, the primary purpose of collecting a history from Beth was to provide appropriate medical treatment, not to create an out-of-court substitute for her testimony. Therefore, the district court

correctly ruled that the statements are not inadmissible under the Confrontation Clause.[13]

> B. *Beth's Statements to the Nurse Are Admissible Hearsay Because They Were Made for Medical Diagnosis or Treatment*

¶126 Najera also argues that the district court erred when it determined that Beth's statements to the nurse, as documented in the SANE report, were admissible as statements for medical diagnosis or treatment under rule 803(4) of the Utah Rules of Evidence. This rule provides an exception to the rule against hearsay for statements made for medical diagnosis or treatment. UTAH R. EVID. 803(4). "Such statements carry a guarantee of trustworthiness" because a patient has a "strong motivation to be truthful when discussing his or her medical condition with a doctor." *Hansen v. Heath*, 852 P.2d 977, 979 (Utah 1993) (cleaned up), *superseded on other grounds by statute as stated in Lancer Ins. Co. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, 391 P.3d 218.

¶127 Rule 803(4) defines these statements as those that are "made for—and [are] reasonably pertinent to—medical diagnosis or treatment; and describe[] medical history; past or present symptoms or sensations; their inception; or their general cause." UTAH R. EVID. 803(4)(A)–(B). To be admissible under this rule, a statement "must satisfy two elements: (1) [t]he statement must be made with an intent to facilitate medical diagnosis or treatment,

---

[13] We note that some courts have parsed the victim's statements during a SANE exam to determine whether the primary purpose of particular statements was testimonial. *See, e.g.*, *Burke*, 478 P.3d at 1108–15 (holding that a victim's "description of the assailant" was testimonial but other statements were nontestimonial). In front of the district court, Najera fought the admission of all the statements Beth made during the SANE exam. Similarly, on appeal, Najera has not attempted to parse the statements but instead argues that the nature of Utah's SANE exam renders all statements made during the exam testimonial. Accordingly, we have analyzed the SANE exam as a whole to determine whether the statements elicited were primarily for a testimonial purpose. We express no view on whether or when it might be appropriate to separately analyze parts of the same exchange to determine primary purpose.

and (2) the statement must in fact be reasonably pertinent to diagnosis or treatment." *Hansen*, 852 P.2d at 979.

¶128 When assessing "whether the proffered statements were 'reasonably pertinent' to the medical provider's diagnosis and treatment tasks," the medical provider's "assessment of the significance of the statements to diagnosis and treatment will weigh heavily in the analysis." 30B WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 6845, Westlaw (database updated Sept. 2025). While "this presumption can give way when the medical professional has some other role, such as working with a police or prosecution team to generate evidence," "courts have proven hesitant to exclude statements that serve a medical purpose even if they also serve an investigative one." *Id.*; *see also State v. Miller*, 2023 UT App 85, ¶ 63, 535 P.3d 390 ("Utah courts have repeatedly held that statements by rape victims made to medical providers describing their abuse are admissible under rule 803(4)." (cleaned up)).

¶129 The district court did not abuse its discretion in ruling that Beth's statements to the nurse, as documented in the SANE report, were admissible under rule 803(4). When Najera objected to the admission of Beth's statements to the nurse, he "objected generally and not specifically to individual statements in the nurse report." The district court accordingly addressed the admissibility of these statements in their entirety, and it concluded that the "statements [were] made for the purposes of medical diagnosis or treatment under [r]ule 803(4)."

¶130 The evidence supported the district court's conclusion. The nurse testified that the "mission" of a SANE is to "medically support patients who have reported violence" and that the questions posed to the victim help guide the exam. The defense's SANE expert also testified that the medical objectives of a SANE exam "are to provide nursing care, identify injury, collect evidence, provide follow-up services, refer for further assessment by a healthcare provider if necessary, and to complete documentation."

¶131 At one of the evidentiary hearings, the nurse testified about the purpose of nearly every question and answer in her report, explaining that their purpose was "to address the possibility of injuries, pregnancy, and sexually transmitted diseases." The nurse testified that certain information on the first page of the report—the date and time of the exam as well as the patient's date of birth, age, complaint, and medical history—is relevant to

medical diagnosis or treatment because a nurse would note that information "with any chart." The date, time, location, and summary of the alleged assault are relevant to medical diagnosis or treatment because this information helps the nurse assess "the injuries" and whether the patient is in the "window" for certain medications, namely "antibiotics" and "pregnancy prophylaxis." Whether the alleged perpetrator was a stranger or a partner is "important" to medical diagnosis or treatment for "multiple reasons" because the patient might have contracted a "sexually transmitted infection[]" from a stranger or "if she lives with that person, it could be a safety issue." The patient's actions and the suspect's actions are relevant to medical diagnosis or treatment because they can explain "injury" and "trauma." Because Beth reported feeling strange after the suspect gave her some water, it was "important" to know "what kind of drugs could be in her system and address her health that way, if needed." And, finally, the history in the strangulation report is relevant to medical diagnosis or treatment because strangulation "can be life-threatening" so the nurse needs to "know how severe it was" so that a physician could order a "CAT scan" if necessary.

¶132 On appeal, Najera has made an effort to parse Beth's statements, arguing that the "statements related to the identity of the perpetrator were not" related to medical diagnosis or treatment. Najera focuses on two details noted in the "Summary of Assault" section of the SANE report—the description of the suspect's clothing and the fact that he had a tattoo. These details were also included in another section of the SANE report, "Suspect's Dress During Assault." The State indicated at one of the evidentiary hearings that it was not attempting to admit that portion of the report. We assume that the State's rationale for not admitting the "Suspect's Dress During Assault" portion of the report would extend to the same details as recounted in the "Summary of Assault" section of the report. But if the State attempts to offer these details at trial, the defense can make a more specific objection to their admission at that time.

¶133 In the face of a blanket objection to Beth's statements to the nurse under rule 803(4), the district court did not abuse its discretion in concluding that Beth's statements in the SANE report were admissible. The nurse explained how nearly every question and answer in her report was "reasonably pertinent to diagnosis or treatment." *Hansen*, 852 P.2d at 979. Accordingly, we affirm the

district court's ruling granting the State's motion in limine to admit those statements.

## CONCLUSION

¶134 The district court correctly concluded that Beth's statements to both the officer and the nurse are nontestimonial and therefore do not implicate the Sixth Amendment's Confrontation Clause. And the district court did not abuse its discretion in concluding that these statements fall within the hearsay exceptions for excited utterances and statements made for purposes of medical diagnosis or treatment, respectively. Accordingly, we affirm the court's ruling granting the State's motions in limine to admit Beth's statements at trial.

———————